Q: Did you learn that information related to a correctional officer named David Pruyne?

A: Yes.

Q: Did you learn that information regarding a correctional officer named Robert Verbickas?

A: Yes.

. . . .

Q: What was that reputation for those people that you learned prior to coming to Florence?

The defendants objected to the last question and the jury was excused while the court determined whether it would permit Mr. Holt to answer. Ultimately, the District Court barred admission of the reputation testimony pursuant to Fed. R. Evid. 403.

Appellants argue that Mr. Holt's affirmative responses to the prosecutor's initial questions is reputation testimony that violated Fed. R. Evid. 404(b). Rule 404(b), however, relates to evidence of other crimes, wrongs, or acts. In other words, it applies to specific instances of conduct. The challenged questions, on the other hand, refer to defendants' reputations for violent behavior, not to any specific instances of conduct, and therefore Rule 404(b) is not implicated. We also question whether this testimony is reputation testimony at all. Mr. Holt merely testified that he had information about whether each Appellant had a reputation for unnecessarily violent behavior; he did not testify as to *what that*

*reputation was*, i.e., that any Appellant had a violent or nonviolent reputation. This question was necessary to establish foundation for the follow-up question. Indeed, the court sustained the Appellants' objection as to that question, and the jury never heard Mr. Holt's answer. We therefore find no abuse of discretion in the admission of such testimony.[15]

The Appellants raise nine other alleged errors in admitting testimony. For these claimed errors, they either fail to identify the statements which they contend were wrongly admitted, fail to meet this court's modest requirement that an appellant provide citations to the record where these statements might be found, or fail to provide argument or legal authority for these alleged errors. Due to these failures, we decline to assess the merits of these arguments. *United States v. McClatchey*, 217 F.3d 823, 825–26 (10th Cir. 2000).

In sum, we have found no error in any of the District Court's discovery and evidentiary rulings. We therefore conclude the Appellants's assertion that the cumulative impact of errors deprived them of a fair trial is without merit.

## IV.  ADDITIONAL ISSUES RAISED BY MR. LAVALLEE

Mr. LaVallee argues that Mr. Blumberg engaged in several instances of prosecutorial misconduct that fatally infected his trial. During trial, Mr.

---

[15]The Appellants also argue that this testimony was hearsay that violated the Sixth Amendment's Confrontation Clause. This argument is without merit, as it is clear that the testimony was not hearsay.

-41-

Blumberg made several references to Mr. LaVallee's attorney, Thomas Hammond. Mr. LaVallee argues that these references permitted the jury to draw an adverse inference from the fact he exercised his Sixth Amendment right to counsel and that therefore his conviction should be reversed. *See United States v. Liddy*, 509 F.2d 428, 442–445 (D.C. Cir. 1974).

Allegations of prosecutorial misconduct are mixed questions of law and fact which we review de novo. *Duckett v. Mullin*, 306 F.3d 982, 988 (10th Cir. 2002). When the defendant makes a timely motion for a mistrial based on prosecutorial misconduct, we review the district court's decision for an abuse of discretion. *United States v. Meienberg*, 263 F.3d 1177, 1180 (10th Cir. 2001). We will not reverse a conviction on the basis of a prosecutor's improper statement to the jury unless there is reason to believe that it influenced the jury's verdict. *Meienberg*, 263 F.3d at 1180. In assessing whether the misconduct had such an impact, we look to the curative acts of the district court, the extent of the misconduct, and the role of the misconduct within the case as a whole. *Id.*

Mr. Blumberg first made reference to Mr. Hammond during redirect examination of Ms. Gutierrez. During the exchange, Mr. Blumberg elicited testimony from her that she had previously met Mr. Hammond at a meeting in the company of the other defendants. Mr. Hammond objected, and the judge held a sidebar conference. During the conference, Mr. Blumberg proffered that Ms. Gutierrez would testify that after the meeting, certain defendants had a discussion

-42-

about not telling their attorneys the truth about the beatings.[16]  The District Court

excused the jury, and Mr. Blumberg questioned Ms. Gutierrez on the issue.  After

her testimony, the District Court found that Mr. Blumberg's proffer at the sidebar

was contrary to what Ms. Gutierrez had just testified.  The court therefore

disallowed the testimony to be relayed to the jury and sanctioned the Government

by prohibiting it from eliciting evidence about a conversation that Ms. Gutierrez

had with Mr. Schultz in which he told her not to tell her lawyer the truth about

what went on in the prison.  The court, however, denied Mr. Hammond's motion

for a mistrial based on the testimony Mr. Blumberg had succeeded in eliciting in

front of the jury—namely, that there had been a meeting among some defendants

and Mr. Hammond—because it found that testimony admissible since six of the

seven defense attorneys had asked Ms. Gutierrez on cross-examination whether

she had ever met with them before.  Even so, when redirect examination resumed,

the District Court gave the jury a cautionary instruction to disregard any

testimony it had heard about that meeting.  We conclude that because the jury

only heard unobjectionable testimony and was, in any event, instructed not to

consider it, the District Court did not abuse its discretion in denying Mr.

Hammond's motion for a mistrial.

---

[16]Mr. Blumberg reasoned that such testimony was relevant to whether the
defendants had willfully deprived the inmates of a constitutional right under 18
U.S.C. § 242.

-43-

Mr. Blumberg again made reference to Mr. Hammond during cross-examination of Mr. LaVallee.  Mr. Blumberg asked whether Mr. LaVallee knew that several murders took place at USP-Florence while he worked there, to which Mr. LaVallee responded that he had no personal knowledge of such murders.  Mr. Blumberg asked, "Was that because you didn't prepare for that [question] with Mr. Hammond?"  Mr. Hammond objected, arguing that the question was improper, but he did not move for a mistrial.  The District Court overruled the objection.   Mr. Blumberg later commented that defense counsel were "peddling" defenses.  Two attorneys objected to the question based on its characterization and that it was argumentative.  No defendant moved for a mistrial.[17]

We need not tarry on whether these remarks constituted prosecutorial misconduct because we are satisfied that they did not affect the trial's outcome. These two flippant remarks must be evaluated in the context of an eight-week trial. This conduct, even if improper, was not "flagrant enough to influence the jury to convict on grounds other than the evidence presented." *See Meienberg*, 263 F.3d at 1180 (quotations omitted).  As such, we conclude that any misconduct was harmless beyond a reasonable doubt.

---

[17]Mr. Blumberg also asked whether it was Mr. LaVallee's belief that Ms. Gutierrez's lawyer had coordinated witness's testimony.  This reference to Ms. Gutierrez's attorney did not involve any adverse inference drawn from Mr. LaVallee's invocation of his right to counsel and we therefore do not address it here.

-44-

## V. ADDITIONAL ISSUES RAISED BY MR. SCHULTZ

A.     Sufficiency of the Evidence

Mr. Schultz argues that the Government lacked sufficient evidence to support his conviction for deprivation of rights under color of law because the testimony of Ms. Gutierrez and Mr. Mitchell was contradictory in several respects.[18] Claims of insufficiency of the evidence are reviewed de novo. *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1129 (10th Cir. 2004). "Evidence is sufficient to support a conviction if, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Hien Van Tieu*, 279 F.3d 917, 921 (10th Cir. 2002).

Mr. Schultz does not dispute that the witnesses, despite their disparate recollection of non-material details, provided testimony which, if believed, satisfied each element of the crimes for which he was convicted. Essentially, then, Mr. Schultz's argument amounts to an attack on Ms. Gutierrez's and Mr. Mitchell's credibility. This argument must be rejected. "To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." *United States v. Owens*, 70 F.3d

---

[18]For instance, the witnesses had differing recollections about what the abused inmate was wearing at the time of the abuse and the relative positions of the other correctional officers in the cell.

1118, 1126 (10th Cir. 1995) (quotations omitted); *see also United States v.
Washita Constr. Co.*, 789 F.2d 809, 816–17 (10th Cir. 1986) (rejecting sufficiency
of the evidence argument based on inconsistencies in testimony of government
witnesses).

B.      Motion for a New Trial

        1.      *Violations Under* Brady v. Maryland *and* California v. Trombetta

        Bureau of Prisons policy requires correctional officers routinely to
videotape any calculated use of force on an inmate.  The warden reviews the
videotapes to ensure that the officers follow the appropriate procedures during the
use of force.  The tapes are retained for up to two years and then destroyed in the
ordinary course of business.  If an incident is serious and has been referred for
possible criminal investigation, the tape might be retained, placed into evidence,
and controlled more closely.

        Beginning in July 2001, the defendants made several requests for the tapes
created on April 5 and 6, 1996 during forced-cell moves of Pedro Castillo, the
inmate whom Mr. LaVallee and Mr. Schultz were convicted of abusing.  After
each request, the BOP responded that the tapes no longer existed.  Mr. Schultz
made one last request for the tapes shortly before his sentencing.  This time, the
Government responded to the request by producing the tape created on April 6,
1996, the day after the incident giving rise to Mr. Schultz's and Mr. LaVallee's
convictions.

-46-

The tape shows Mr. Castillo slashing at his chest and legs, attempting to draw blood. Mr. Schultz approaches the cell and instructs Mr. Castillo to put his hands through the food gate so that he can be handcuffed. Mr. Castillo complies and Mr. Schultz enters the cell to fasten a chain around Mr. Castillo's waist. Mr. Schultz then escorts Mr. Castillo to the x-ray room without incident. Mr. Schultz moved for a new trial, arguing that the Government suppressed favorable and material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

When the Government withholds evidence on demand of a defendant which, if made available, would tend to exculpate him, it violates the due process rights of that defendant. *Brady*, 373 U.S. at 87. The Government's good faith is not relevant. *Id.* While we ordinarily review a district court's denial of a motion for a new trial for an abuse of discretion, when the motion is based on an alleged *Brady* violation, we review the district court's decision de novo. *See United States v. Combs*, 267 F.3d 1167, 1172 (10th Cir. 2001). To establish a *Brady* violation, "a defendant must demonstrate (1) the prosecution suppressed evidence,[19] (2) the evidence was favorable to defendant, and (3) the evidence was material." *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir.

---

[19]The "prosecution" for *Brady* purposes encompasses not only the prosecutors handling the case, but also extends to law enforcement personnel and governmental entities involved in investigative aspects of a particular criminal venture. *Smith v. Sec'y of N.M. Dept. of Corrs.*, 50 F.3d 801, 824 (10th Cir. 1995).

-47-

1999). There is no dispute in this case that the prosecution suppressed evidence within the meaning of *Brady*. We therefore concentrate our analysis on the remaining two factors.

Evidence is favorable to the defendant if it constitutes either exculpatory or impeachment evidence. *Smith v. Sec'y of N.M. Dept. of Corrs.*, 50 F.3d 801, 825 (10th Cir. 1995). Mr. Schultz argues that the evidence is favorable to him because it shows Mr. Castillo cutting at his chest and legs to draw blood. According to Mr. Schultz, this casts doubt on the Government's theory of the case—that the defendants fabricated a reason to move Mr. Castillo from his cell to beat him—and supports his defense that Mr. Castillo was in fact trying to injure himself the previous day. He also argues that it is favorable because it shows Mr. Schultz and Mr. Castillo interacting without incident. The Government counters that this tape does not rebut their theory of the case—inmate Castillo was a known self-mutilator and the Government's theory was that the defendants falsely claimed that he had been cutting himself on April 5 precisely because it was a plausible explanation for entering his cell. In this regard, the tape is consistent with the Government's evidence. We need not conclusively resolve whether this evidence was favorable to Mr. Schultz, however, because we find that it was not material to his guilt.

Evidence is material to the defendant if it creates a "reasonable probability that, 'had the evidence been disclosed to the defense, the result of the proceeding

-48-

would have been different.'" *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)). Mr. Schultz argues that there is a reasonable probability that had the videotape been disclosed he would have been acquitted because it defies common sense to believe that Mr. Castillo would cooperate with Mr. Schultz if Mr. Schultz had abused him the previous day.

To the contrary, the District Court found, and we agree, that the videotape is consistent with the fact that Mr. Castillo was beaten the previous day and does not cast sufficient doubt on the fact that Mr. Schultz participated in that abuse. The Government presented evidence at trial that on April 5 Mr. Castillo was beaten in the kidney area. The video shows Mr. Castillo's abdomen wrapped in bandages consistent with the area of beating. Further, the video shows Mr. Castillo moving somewhat gingerly, which is also consistent with testimony that he was abused the previous day. That the video shows Mr. Schultz and Mr. Castillo interacting without incident does not undermine our confidence in the outcome of the trial. As the District Court noted, "[i]t is a fact of life that in a prison setting, prisoners are forced to interact on a daily basis with the correctional officers, even those officers that may have mistreated or abused the prisoners." The tape merely shows Mr. Castillo cooperating with the officers the

-49-

day after the assault and as such, it has little bearing on what occurred the previous day. *Cf. Engberg v. Wyoming*, 265 F.3d 1109, 1118 (10th Cir. 2001) (evidence that creates a mere "possibility" of a different result does not meet the standard for "reasonable probability"). We therefore hold that the evidence was not material and, as such, Mr. Schultz's due process rights were not violated.

Mr. Schultz also argues that the Government's destruction of the April 5, 1996 videotape violated his due process rights and warrants a new trial under *California v. Trombetta*, 467 U.S. 479 (1984). Mr. Schultz did not raise this issue to the District Court. Accordingly, we review the District Court's failure sua sponte to realize that the destruction warranted a new trial only for plain error. Fed. R. Crim. P. 52(b); *United States v. McDonald*, 933 F.2d 1519, 1524 (10th Cir. 1991).

For the government's destruction of evidence "to rise to the level of affecting a defendant's due process rights under *California v. Trombetta*, the evidence 'must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of a nature that the defendant would be unable to obtain it by other reasonably available means.'" *United States v. Pearl*, 324 F.3d 1210, 1215 (10th Cir. 2003) (quoting *Trombetta*, 467 U.S. at 489)). In addition, the defendant must show that the government acted in bad faith. *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)).

Even if Mr. Schultz could show that the exculpatory value of the video was

-50-

apparent before the video was destroyed, he fails to show that the tape was destroyed in bad faith. He argues that the failure of the Government to preserve the tape undermines the only reason the tape was created in the first place and it was therefore done in bad faith. To the contrary, there is unrebutted testimony that these tapes, used to ensure that the correctional officers used the proper procedures during forced-cell moves, were routinely destroyed in the ordinary course of business approximately two years after their creation. Mr. Schultz notes that the Government first became aware that Mr. Castillo was beaten when it spoke with Ms. Gutierrez in February 2000, nearly four years after the incident. When the defendants made their first request for the video in 2001, it had already been destroyed. Therefore, Mr. Schultz has failed to establish the District Court plainly erred in not granting a new trial on its own initiative due to the Government's bad-faith destruction of exculpatory evidence.

2.    *Newly discovered evidence*

During the investigation that led to Mr. Schultz's indictment, FBI investigators questioned Mr. Castillo. Mr. Castillo told the investigators that he was beaten by several correctional officers around the first of April 1996. Though he could not recall all of the officers' names who participated in the abuse, he did state that all the officers who took part in the forced-cell move committed the abuse. He did not identify Mr. Schultz by name. Since Mr. Schultz was on duty that night, however, the Government began investigating

-51-

him.  Several of Mr. Schultz's coconspirators identified him as a participant.  In February 2001, the Government filed a superceding indictment against Mr. Schultz for the abuse of Mr. Castillo.  He was tried and convicted over two years later in June 2003.

Mr. Castillo was incarcerated until May 2002.  During this time, Mr. Schultz never attempted to interview Mr. Castillo about his allegations of abuse.  Nor did Mr. Schultz attempt to locate Mr. Castillo after his release but prior to trial.  Mr. Castillo was not a witness at trial.  After Mr. Schultz was sentenced to 41 months' imprisonment in November 2003, however, he employed a private investigator to locate Mr. Castillo; the investigator found Mr. Castillo within six weeks.  After finding him, the investigator showed Mr. Castillo a photo of Mr. Schultz and asked whether Mr. Schultz ever beat him.  Mr. Castillo responded that Mr. Schultz had not done so and that, in fact, Mr. Schultz had treated him with dignity and respect.[20]  Mr. Schultz filed a motion for a new trial, which the District Court denied.

---

[20]We note, however, that Mr. Castillo's testimony is hardly conclusive of the issue.  Mr. Castillo provided several inconsistent statements regarding Mr. Schultz's participation in the abuse.  For example, he stated he believed Mr. Schultz did not participate in the beating because Mr. Castillo "was sure [Mr. Schultz] had not been on duty or present" that night.  After being presented with information that Mr. Schultz admitted not only to being present, but also to participating in the forced-cell move, Mr. Castillo acknowledged that his memory of the events seven years earlier was vague and that he could not positively state whether Mr. Schultz took part in the abuse.

Federal Rule of Criminal Procedure 33 authorizes a district court to grant a new trial if the interests of justice require one. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). We review rulings on a motion under Rule 33 for an abuse of discretion. *Id.* We apply a five-part test to determine whether newly discovered evidence warrants a new trial. *Id.* at 1147. The defendant must show:

> (1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*Id.*

The District Court denied Mr. Schultz's motion for several reasons. First, the court found that Mr. Schultz did not use due diligence in attempting to locate Mr. Castillo before trial. Second, the court determined that Mr. Castillo's statements constituted only impeachment evidence because previous statements he had made to the FBI were inconsistent with his current statements. Last, the District Court concluded that there was not a reasonable probability that the evidence would result in an acquittal if Mr. Schultz was to be given a new trial. Because we agree that Mr. Schultz failed to exercise due diligence in discovering the evidence before trial, we need not address whether Mr. Castillo's testimony is merely impeaching or whether there is a reasonable probability that it would

result in an acquittal.

Due diligence does not require that a defendant exercise the highest degree of diligence possible to locate evidence prior to trial; only "reasonable diligence" is required. *United States v. Allen*, 554 F.2d 398, 403 (10th Cir. 1977). This requirement prevents defendants from keeping "an evidentiary trump card in the event of a conviction." *Quintanilla*, 193 F.3d at 1147. Mr. Schultz does not dispute that he made no attempt to interview Mr. Castillo before trial. Nor can he argue that he was unable to interview Mr. Castillo before trial, as Mr. Castillo was incarcerated for a full fifteen months after the Government filed the superceding indictment against Mr. Schultz. Rather, he contends that the standard for diligence should be lowered because the Government produced misleading reports that indicated Mr. Castillo had identified him as one of the abusers. As support for this proposition he cites our decision in *United States v. Sinclair*, 109 F.3d 1527, 1532 (10th Cir. 1997) in which we refused to apply the Seventh Circuit's lower standard for evaluating the fifth prong of the test—that is, when newly discovered evidence would likely produce an acquittal after a subsequent trial. We stated:

> [W]e are unwilling to apply the *Larrison* possibility standard when, as here, the allegedly false testimony is merely impeaching. We recognize that the possibility standard applied in *Larrison* and subsequent cases might be appropriate when the government has knowingly, recklessly, or negligently offered false testimony. However, Mr. Sinclair has not alleged, nor does the record show, that the government knowingly, recklessly, or negligently used Dallas

-54-

Woods's testimony about his school attendance. We therefore conclude that the *Larrison* possibility standard should not be applied under the circumstances in this case.

*Id.* at 1532 (citing *Larrison v. United States*, 24 F.2d 82 (7th Cir. 1928)).

Mr. Schultz argues that the Government knowingly, recklessly, or negligently offered misleading documents and that such conduct should lessen his due diligence requirement. We decline to adopt such an approach. The requirement of "reasonable diligence" adequately accounts for any misconduct by the Government. Moreover, the reports from the interviews of Mr. Castillo do not falsely claim that Mr. Castillo identified Mr. Schultz personally. They merely state that Mr. Castillo alleged that he was beaten by all the officers who participated in the forced-cell move—and Mr. Schultz admits that he participated in that process. We therefore find no abuse of discretion on the part of the District Court in denying Mr. Schultz's motion for a new trial.

3.   *Prosecutorial Misconduct*

Last, Mr. Schultz argues that the prosecution, knowing that the April 5, 1996 videotape of Mr. Castillo's forced-cell move was destroyed in the ordinary course of business, misrepresented to the jury that the defendants destroyed the tape as part of their conspiracy to deprive Mr. Castillo of his constitutional rights.[21]

---

[21]We note that Mr. Schultz's argument on this basis cuts against his

(continued...)

-55-

It does appear that part of the Government's pre-trial theory of the case was that the conspirators destroyed the tape to cover up any evidence of abuse. At trial, however, the only statement that Mr. Schultz complains of with respect to the defendants' alleged destruction of the tape came in closing argument when Mr. Blumberg said that "the removal of the video *camera* was a fake." (emphasis added). This statement in no way indicates that Mr. Schultz destroyed the tape inside the camera. Rather, it references Mr. Schultz's role in the conspiracy—his job was to knock over the video camera so that it would not record the ensuing abuse. Because Mr. Blumberg did not argue before the jury that the defendants destroyed this evidence to cover up their crime, Mr. Schultz's argument is simply without merit.

## VI. SENTENCING

We now turn to issues concerning the Appellants' sentences. Mr. Verbickas was found guilty of a single count of deprivation of civil rights in violation of 18 U.S.C. § 242. The base offense level for a conviction under § 242 is governed by U.S.S.G. § 2H1.1, "Offenses Involving Individual Rights," which directs the court to apply the greatest offense level of:

> (1) the offense level from the offense guidelines applicable to any underlying offense;

---

[21](...continued)
argument that the Government destroyed the tape in bad faith in violation of his due process rights under *Trombetta.*

-56-

      (2) 12, if the offense involved two or more participants;
      (3) 10, if the offense involved
           (A) the use of threat of force against a person or
           (B) damages or the threat of property damages; or
      (4) 6, otherwise.

U.S.S.G. § 2H1.1(a). The District Court calculated Mr. Verbickas's base offense level at 12 because it concluded that the offense involved two or more participants. *See* U.S.S.G. § 2H1.1(a)(2). It then imposed a six-level enhancement because the offense was committed under color of law, *see* U.S.S.G. § 2H1.1(b)(1); a two-level enhancement because Mr. Lane was a vulnerable victim, *see* U.S.S.G. § 3A1.1(b)(1); and a two-level enhancement because Mr. Lane was restrained during the assault, *see* U.S.S.G. § 3A1.3. The resulting base offense level was 22. The District Court then departed downward two levels because it determined that Mr. Verbickas was especially susceptible to abuse in prison. *See* U.S.S.G. § 5K2.0 (permitting downward departures for circumstances not adequately taken into consideration by the Guidelines). The court further departed another two levels because it found both that the assault was aberrant behavior, *see* U.S.S.G. § 5K2.20, and that Mr. Lane's misconduct substantially contributed to provoking the assault, *see* U.S.S.G. § 5K2.10. The resulting offense level was 18, and Mr. Verbickas had a criminal history score of I, which subjected him to a sentence of 27–33 months' imprisonment. The District Court sentenced him to 30 months. Mr. Verbickas challenges each of the sentencing enhancements except for the under color of law enhancement under *United States*

-57-

*v. Booker*, arguing that his offense level before the court's downward departure should only have been 16, *see* U.S.S.G. §§ 2H1.1(a)(3) and (b)(1), with a resulting sentencing range of only 21–27 months.

Messrs. LaVallee and Schultz were found guilty both of conspiracy under 18 U.S.C. § 241 as well as a substantive offense under 18 U.S.C. § 242 for the assault of Mr. Castillo.  Because both offenses were committed by two or more people, the District Court determined the base level for both men to be 12.  *See* U.S.S.G. § 2H1.1(a)(2).  As it had with Mr. Verbickas, the District Court applied a six-level enhancement for acting under color of law, *see* U.S.S.G. § 2H1.1(b)(1); a two-level enhancement for a vulnerable victim, *see* U.S.S.G. § 3A1.(b)(1); and a two-level enhancement for committing the offense while the victim was restrained, *see* U.S.S.G. § 3A1.3.  Because the Guidelines prohibit the grouping of conspiracy and substantive offenses when the conspiracy has another object besides the substantive offense, *see* U.S.S.G. § 3D1.2 cmt. 4, the District Court added another two levels under U.S.S.G. § 3D1.4(a) (requiring the addition of two levels for offenses constituting two equally serious groups).  The court then granted a two-level departure for susceptibility to abuse in prison.  *See* U.S.S.G § 5K2.0.  With a resulting offense level of 22 and a criminal history score of I, the applicable Guidelines range was 41–51 months' incarceration. Messrs. LaVallee and Schultz were both sentenced to 41 months.  Both contend that the District Court committed error under *Booker* which resulted in the

-58-

imposition of a higher sentence than that warranted by facts found by the jury.

A.    Booker *Error*

In *Booker*, the Supreme Court held that the Sixth Amendment requires that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S. Ct. at 756. As a remedy, the Court severed the statutory section requiring district courts to sentence within the Guidelines range. *Id.* at 756–57. We recognize two types of *Booker* errors: constitutional and non-constitutional. *United States v. Gonzalez-Huerta*, 403 F.3d 727, 731 (10th Cir. 2005). A constitutional *Booker* error occurs when a court "[relies] upon judge-found facts, other than those of prior convictions, to enhance a defendant's sentence mandatorily." *Id.* A non-constitutional error arises when a sentencing court "appl[ies] the Guidelines in a mandatory fashion, as opposed to a discretionary fashion, even though the resulting sentence was calculated solely upon facts that were admitted by the defendant, found by the jury, or based upon the fact of a prior conviction." *Id.* at 731–32. These appeals allege constitutional *Booker* error.

Because all three Appellants challenge such error for the first time on appeal, we review for plain error. Fed. R. Crim. P. 52(b); *Gonzalez-Huerta*, 403 F.3d at 732. To establish plain error, the Appellants "must demonstrate that (1)

-59-

the District Court committed error, (2) that the error was plain, and (3) that the

plain error affected [their] substantial rights. *United States v. Dazey*, 403 F.3d

1147, 1174 (10th Cir. 2005). If each condition is met, "a court reviewing the

error may exercise discretion to correct it if the error seriously affects the

fairness, integrity, or public reputation of judicial proceedings." *Id.* When

reviewing a potential constitutional error, we conduct this analysis less rigidly.

*Id.* "By now, it is axiomatic under plain error review that a court commits error

that is plain when it enhances a defendant's sentence based on judicially-found

facts." *United States v. Taylor*, 413 F.3d 1146, 1155 (10th Cir. 2005). We will

therefore limit our review to the third and fourth prongs of the plain error test.

To satisfy their burden on the third prong of plain error, the Appellants

must establish that their substantial rights were affected—that is, they must show

to a "reasonable probability" that the error in sentencing affected the outcome of

the proceedings. *Dazey*, 403 F.3d at 1175. We have identified at least two ways

a defendant can make this showing in the case of constitutional *Booker* error:

> First, if the defendant shows a reasonable probability that a jury
> applying a reasonable doubt standard would not have found the same
> material facts that a judge found by a preponderance of the evidence,
> then the defendant successfully demonstrates that the error below
> affected his substantial rights. . . . Second, a defendant may show
> that the district court's error affected his substantial rights by
> demonstrating a reasonable probability that, under the specific facts
> of his case as analyzed under the sentencing factors of 18 U.S.C. §
> 3553(a) the district court judge would reasonably impose a sentence
> outside the Guidelines range.

-60-

*Id.* (footnote omitted).

If the Appellants satisfy the first three prongs of plain error review, they must then persuade this Court that the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. We have stated that a defendant can meet this burden by presenting evidence that:

> (a) a sentence increased substantially based on a *Booker* error; (b) a showing that the district court would likely impose a significantly lighter sentence on remand; (c) a substantial lack of evidence to support the entire sentence the Guidelines required the district court to impose; (d) a showing that objective consideration of the § 3553(a) factors warrants a departure from the sentence suggested by the Guidelines; or (e) other evidence peculiar to the defendant that demonstrates a complete breakdown in the sentencing process.

*United States v. Serrata*, 425 F.3d 886, 919 (10th Cir. 2005).

1.     *Mr. Verbickas's Sentence*

Mr. Verbickas has failed to satisfy the third prong of establishing plain error. First, he has failed to show that a jury applying a reasonable doubt standard would not have found the same material facts. Indeed, Mr. Verbickas did not challenge the factual basis of any of the enhancements at the District Court (and does not do so here). Rather, with respect to the enhancements based on the condition of the victim (restrained and vulnerable), Mr. Verbickas's contentions were legal claims.[22] *Cf. United States v. Riccardi*, 405 F.3d 852, 876

---

[22]For example, Mr. Verbickas argued that if the District Court imposed one of the enhancements, it should not impose the other because it would constitute
(continued...)

-61-

(10th Cir. 2005) (in harmless error analysis, stating that defendant's decision not to contest the facts supporting an enhancement indicates that constitutional *Booker* error did not affect substantial rights). Moreover, the record is replete with testimony that Mr. Lane was in fact restrained and that he was in fact "vulnerable" within the meaning of the Guideline provision. *See* U.S.S.G. § 3A1.1; *United States v. Lambright*, 320 F.3d 517, 518 (5th Cir. 2003) (inmate who was completely dependent on correctional officers for care, was locked in cell, and was unable to protect himself from assault was vulnerable victim); *United States v. Hershkowitz*, 968 F.2d 1503, 1504–06 (2d Cir. 1992) (inmate beaten while surrounded by correctional officers was vulnerable victim). With respect to the enhancement based on the offense involving two or more participants, the record shows that Ms. Gutierrez pleaded guilty to abusing Mr. Lane. Finally, it is clear from the jury's verdict that it found Mr. Verbickas was acting under color of law. Indeed, a finding that the defendant acted under color of law in depriving an inmate of a constitutional right was explicitly listed as an element of § 242 in the jury instructions. Accordingly, Mr. Verbickas has in no way demonstrated that a jury applying a reasonable doubt standard would not have found the same facts as the District Court which gave rise to the enhancements.

---

[22](...continued)
impermissible "double counting," which he does not raise here.

-62-

Second, Mr. Verbickas has failed to show that the District Court, applying the sentencing factors in § 3553(a), might have imposed a sentence outside the Guidelines range.  The judge did not express any dissatisfaction with the length of the sentence or indicate that he felt that it was inappropriate in light of all the circumstances.  *See Dazey*, 403 F.3d at 1175.  Further, the District Court imposed a sentence in the middle of the applicable Guidelines range, even though it was within the court's power to impose a shorter sentence under the pre-*Booker* scheme.  That it was not inclined to do so suggests that the judge would not exercise "his now greater [post-*Booker*] discretion to reduce the sentence." *United States v. Riccardi*, 405 F.3d 852, 876 (10th Cir. 2005).

We are aware that this Court recently found that constitutional *Booker* error affected a defendant's substantial rights even though the district court had granted a five-level downward departure that took into consideration several of the sentencing factors recommended by § 3553(a)(1).  *See Serrata*, 425 F.3d at 918. Though the District Court in this case took several of the § 3553(a)(1) sentencing factors into account in granting Mr. Verbickas a two-level downward departure, we think that *Serrata* is distinguishable for several reasons.  First, in *Serrata* we found that "the most telling evidence" that the defendant's substantial rights were violated was that the district court "repeatedly expressed its dissatisfaction with the guidelines" and stated that it would sentence each defendant to probation if the Guidelines so permitted.  *Id.* at 919.  Second, the district court sentenced each

-63-

defendant to the lowest possible sentence in the applicable Guidelines range. *Id.* Third, this Court found that the district court abused its discretion in departing downward—we acknowledged that although departure was not warranted under the Guidelines, post-*Booker*, the same factors may warrant departure pursuant to § 3553(a)(1).[23] *Id.; cf. United States v. Ollson*, 413 F.3d 1119, 1121 (10th Cir. 2005) (finding that defendant's substantial rights not violated when district court properly exercised discretion to depart downward and could have departed further if it determined further departure was warranted).  None of these circumstances are present in this case.  We therefore conclude that Mr. Verbickas has failed to establish that but for the improper judicial fact-finding, the result of his proceeding would have been different.

> 2.    *Mr. LaVallee's and Mr. Schultz's Sentences*

As noted above, the enhancement for acting under color of law, *see* U.S.S.G. § 2H1.1(b)(1), is fully reflected in the jury's verdict.  The same can be said of the enhancement under U.S.S.G. § 2H1.1(a)(2) (offense committed by two or more people) because both Mr. LaVallee and Mr. Schultz were convicted of conspiracy under 18 U.S.C. § 241, which requires "two or more persons" as an

---

[23]We also note that because the court in *Serrata* held that the district court abused its discretion in imposing a five-level downward departure thus requiring remand, the court's discussion of *Booker* error is dicta.  *See United States v. Sims*, 428 F.3d 945, 966 (10th Cir. 2005) (declining to address *Booker* issues when district court abused its discretion in departing downward).

element of the offense.  Accordingly, these enhancements do not constitute

constitutional *Booker* error.

In addition, the facts giving rise to the two-level enhancement under

U.S.S.G. § 3D1.4(a), which is predicated on a finding that the substantive offense

was not "the sole object of the conspiracy," *see* U.S.S.G. § 3D1.2 cmt. 4, are also

implicit in the jury's verdict.  The jury instructions provided that the jury must

find beyond a reasonable doubt that the Government proved "that the single

overall conspiracy alleged in Count I of the superceding indictment existed."  The

superceding indictment alleged that the defendants engaged in a conspiracy to (1)

unjustifiably strike, kick, assault, injure, and physically punish inmates; (2)

falsely justify uses of force against inmates by falsifying records and fabricating

injuries; (3) threaten officers to secure their silence; and (4) perpetuate an

environment within the prison allowing unlawful beatings and assaults against

inmates to continue indefinitely and with impunity.  Clearly, then, the jury's

guilty verdict against Mr. LaVallee and Mr. Schultz on the conspiracy charge

reflects the fact that the Government proved beyond a reasonable doubt that the

beating of Mr. Castillo was not the sole object of the conspiracy.  Therefore, this

enhancement is also not constitutional *Booker* error.

Accordingly, only the other two enhancements—one two-level

enhancement for a vulnerable victim and another two-level enhancement for a

restrained victim—potentially violate *Booker*.  Without these enhancements, the

sentencing range supported by the jury's findings was 33–41 months'

imprisonment, based on an offense level of 20 rather than 24.  The District Court

exercised its discretion to depart downward two levels from 24 to 22, however,

and thus calculated the applicable sentencing range to be 41–51 months; the court

ultimately sentenced both Mr. LaVallee and Mr. Schultz to 41 months.  We stated

in *United States v. Yazzie* that:

> *Booker* made clear that it is the actual sentence, not the sentencing
> range, that must not be increased based upon judge-found facts in
> order to violate the Sixth Amendment: "Accordingly, we reaffirm our
> holding in *Apprendi*: Any fact (other than a prior conviction) which
> is necessary to support a *sentence* exceeding the maximum
> authorized by the facts established by a plea of guilty or a jury
> verdict must be admitted by the defendant or proved to a jury beyond
> a reasonable doubt."

407 F.3d 1139, 1144 (10th Cir. 2005) (quoting *Booker*, 125 S. Ct. at 756).

Because the District Court's judicial fact-finding did not increase the sentence

beyond that authorized by the jury's verdict, there was no constitutional error.

*Id.*; *see also United States v. Small*, 423 F.3d 1164, 1188 (10th Cir. 2005).

Nevertheless, it is clear on appeal that the District Court's mandatory

application of the Guidelines still constitutes non-constitutional *Booker* error that

is plain.  We need not decide whether Messrs. LaVallee's and Schultz's

substantial rights were affected, however, because they have failed to satisfy their

burden on the fourth prong of plain error analysis.  *See Yazzie*, 407 F.3d at 1146

(declining to conduct a substantial-rights analysis because defendant could not

satisfy the fourth prong of plain-error review).  We will not notice non-constitutional error "unless it is both particularly egregious and our failure to notice the error would result in a miscarriage of justice." *Id.*  The Appellants have made no such showing here.

B.     Cross-Appeal

It its cross-appeal, the Government raises three arguments.  First, it argues that the District Court erred in failing to impose an enhancement to each Appellant's sentence for obstruction of justice.  Second, it argues that the District Court erred in granting the Appellants a two-level downward departure due to their susceptibility to abuse in prison.  Third, it argues that the District Court erred in granting Mr. Verbickas an additional two-level downward departure due to the inmate's provocation of the offense behavior and Mr. Verbickas's aberrant behavior.

Post-*Booker,* district courts, though not bound by the Guidelines, must consult the Guidelines and consider them in sentencing.  *See Booker*, 125 S. Ct. 738, 767 (2005).  This consultation requirement normally obliges the district court to calculate correctly the sentencing range prescribed by the Guidelines.  *See United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir.2005); *United States v. Sierra-Castillo*, 405 F.3d 932, 936 n.2 (10th Cir. 2005).  In considering the district court's application of the Guidelines, we review its factual findings for clear error, and its legal determinations de novo.  *Serrata*, 425 F.3d at 906.

"We give due deference to the district court's application of the guidelines to the facts." *Id.* (quotation omitted).

The Government first argues that the District Court erred in failing to apply an obstruction of justice enhancement to each of their sentences pursuant to U.S.S.G. § 3C1.1. As an initial matter, we recognize that if the District Court had applied the obstruction of justice enhancement to increase the Appellants' sentences mandatorily, it would have committed constitutional *Booker* error. *See United States v. Corchado*, 427 F.3d 815, 821 (10th Cir. 2005). *Booker* made its remedial interpretation of the Guidelines applicable to all cases on direct review, however, and we therefore must still consider the merits of the Government's cross-appeal. *See Booker*, 125 S. Ct. at 769; *United States v. Lynch*, 397 F.3d 1270, 1272 (10th Cir. 2005).

With respect to this claimed error, the Government suffers the same fate as the Appellants in their claim of error related to the discovery of alleged promises made to Ms. Gutierrez in exchange for her testimony. The District Court's ruling on this issue is conspicuously missing from the transcript and the Government has otherwise failed to point to the place in the record where this discussion is found. Because we must be informed by the District Court's findings of fact and its application of the Guidelines to the facts, the Government's failure to ensure that the record has been supplemented with the relevant transcripts is fatal to its claim. *See* 10th Cir. R. 28.2(C)(2), (3); *United States v. LaHue*, 261 F.3d 993,

-68-

1014–1015 (10th Cir. 2001).

Next, the Government argues that the District Court erred in granting each Appellant a two-level downward departure based on their susceptibility to abuse in prison under U.S.S.G. § 5K2.0.  We review downward departures under a unitary abuse of discretion "which includes review to determine that the discretion of the district court was not guided by erroneous legal conclusions." *United States v. Collins*, 122 F.3d 1297, 1302 (10th Cir. 1997) (quotation and alteration omitted).  In determining whether the district court abused its discretion this Court must evaluate: (1) whether the factual circumstances supporting a departure are permissible departure factors; (2) whether the departure factors relied upon by the district court remove the defendant from the applicable Guideline heartland thus warranting a departure, (3) whether the record sufficiently supports the factual basis underlying the departure, and (4) whether the degree of departure is reasonable. *Id.*  Here, the Government claims only that the District Court erred in finding that the Appellants' susceptibility to abuse in prison removed them from the heartland of cases thus warranting departure.

The fact that police officers are susceptible to abuse in prison does not, alone, warrant a downward departure. *See Koon v. United States*, 518 U.S. 81, 112 (1996).  Indeed, in many instances, committing a crime while acting under color of law will result in a higher sentence—as it did in this case—rather than a lower sentence. *See* U.S.S.G. § 2H1.1(b)(1) (permitting enhancement when

-69-

offense is committed under color of law).  However, when a district court

determines that the defendants' susceptibility to abuse is compounded by

"widespread publicity and emotional outrage . . . [this] is just the sort of

determination that must be accorded deference by the appellate courts."  *Koon*,

518 U.S. at 112.

Relying on *Koon,* the District Court found that this case was outside the

heartland of the Guidelines because it was part of a vast investigation, spanning

several years, that involved not only the abuse of inmates by correctional officers,

but also the conspiracy to abuse inmates.  In addition to evidence of the size and

scope of the investigation, the District Court was presented with other evidence

that this case was outside the heartland of cases.  For example, there was evidence

that the investigation was reported on in a publication distributed among federal

inmates; that because of the Appellants' notoriety they were on 23-hour

lockdown; and that other inmates threatened the Appellants' lives and described

the types of sexual acts they would commit upon their bodies once they were

dead.  Based on these circumstances, the District Court felt that a two-level

downward departure was warranted.  We find no abuse of discretion in that

determination.

Finally, we address the Government's argument that the District Court

abused its discretion in granting Mr. Verbickas a two-level downward departure

based on the combined reasons of Mr. Verbickas's aberrant behavior, *see*

-70-

U.S.S.G. § 5K2.20, and the victim's misconduct that substantially contributed to provoking the offense behavior, *see* U.S.S.G. § 5K2.10.

Section 5K2.10 provides that:

If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense.

U.S.S.G. § 5K2.10. We first note that victim provocation is an "encouraged departure factor." *Koon*, 518 U.S. at 94 (citing U.S.S.G. § 5K2.10). Further, the provoking conduct need not immediately precede the offense behavior. *Id.* at 104; *see also* U.S.S.G. § 5K2.10(3) (instructing courts to consider the danger perceived by the defendant and the victim's reputation for violence). In this case, there was testimony that Mr. Lane made sexually explicit remarks to a female officer, threatened Mr. Verbickas immediately before the assault, and made an aggressive move toward him. Indeed, the District Court noted Mr. Lane's "surly" behavior in granting the departure.

The aberrant behavior exception may apply in an exceptional case when "the defendant committed a single criminal occurrence or single criminal transaction that (1) was committed without significant planning; (2) was of limited duration; and (3) represents a marked deviation by the defendant from an otherwise law-abiding life." U.S.S.G. § 5K2.20(a), (b). The conduct for which Mr. Verbickas was convicted meets the three requirements of § 5K2.20(b), and there is substantial evidence in the record that this was also an exceptional case,

-71-

thus warranting a departure.  We therefore find no abuse of discretion in this case.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the Appellants' convictions and sentences.

No. 03-1515, *United States v. Verbickas*

No. 03-1522, *United States v. LaVallee*

No. 03-1523, *United States v. Schultz*

No. 04-1000, *United States v. Verbickas*

No. 04-1540, *United States v. Schultz*

**BRISCOE**, Circuit Judge, concurring:


I concur in the judgment but write separately to address the issue of
Grundy's disqualification, as it relates to LaVallee and Schultz, in greater detail.

I.

Grundy's relationship with the defendants was first brought to the attention
of the district court in July 2001, when defendant Gall, who was later acquitted,
filed a motion to suppress statements he gave to FBI agents and prosecutors
during the pre-indictment investigation.[1]  In support of his motion, Gall argued
that he was confused and/or misled by Grundy regarding his right to legal
representation at the time he gave the statements to the FBI agents and
prosecutors.  The district court held an evidentiary hearing on Gall's motion on
September 25, 2001.  ROA, Vol. X.  Upon being called by Gall's defense counsel,
Grundy first testified generally about her duties at USP-Florence in 1999.
According to Grundy, in early 1999 she "was the supervisory attorney with

---

[1] Defendant Pruyne filed a similar motion, but ultimately withdrew it.
ROA, Vol. X, at 142.

responsibilities for providing legal services to" employees "of the facilities at Florence" "[i]n connection with their jobs . . . ." Id. at 93.  With respect to correctional officers who were sued by inmates alleging abuse, Grundy testified that she would "assist the staff member, if they request[ed] representation by the Department of Justice, in obtaining representation or making the request itself . . . ." Id.  In doing so, she would "ask them" for their version of "what happened." Id.  Then, "[i]f representation [wa]s granted," she would "assist the United States attorney's office . . . in providing the defense to the civil suit of that particular employee." Id.  Grundy then testified about her dealings with defendant Gall.  In 1997, Grundy was contacted by either the FBI or an attorney from the DOJ's Civil Rights Division staff and informed that they "would be looking to interview certain correctional officer witnesses . . . ." Id. at 126.  Grundy was further informed that, other than being criminal in nature, she could not be told the nature of the investigation being conducted. Id. at 128.  In March 1999, and again in July 1999, Grundy was asked by investigators to arrange interviews for them with defendant Gall. Id. at 129.  In arranging those interviews, Grundy informed Gall that DOJ lawyers and FBI agents were interested in speaking with him, id., and that he was free to speak or not speak with them. Id. at 130.  Grundy further informed Gall that she "could not help him with" the interviews and that she "wasn't going in there." Id. at 131.  According to Grundy, Gall did not ask her to arrange legal or union representation for him. Id. at 131-32.  The district court

-2-

ultimately denied Gall's motion. Id. at 236.

Approximately nineteen months later, on April 21, 2003 (the tenth day of trial), all of the defendants filed a joint motion to disqualify Grundy for violating Colorado Rules of Professional Conduct 1.6(a), 1.9, and 1.11(b) and (e). ROA, Vol. V, Doc. 1080. In their motion, defendants alleged that Grundy, who by that time was working as an assistant general counsel for the BOP nationally, provided prior representation to them in several respects. In particular, defendants alleged that while they were employed as correctional officers at USP-Florence, various civil actions were filed against them by inmates, and that Grundy acted as their legal counsel in connection with these actions. Id. at 2-3. One such civil action was filed by inmate William Turner and concerned the same alleged conduct that was listed as one of the overt acts in Count I of the superseding indictment, and that formed the basis for Count VIII of the superseding indictment (the jury acquitted defendants LaVallee, Schultz, and Bond on this latter count). In turn, defendants alleged that Grundy played two roles in the prosecution of the case against them. First, defendants alleged that Grundy "provided 'liaison' coordination between the BOP and the United States Attorney's Office prosecuting this action until sometime prior to April 1, 2002 as a BOP employee." Id. Second, defendants alleged that "Grundy became a contract attorney for the United States Attorney prosecuting th[e] matter before the commencement of th[e] trial." Id. "In that role," defendants alleged, "Grundy participated in

-3-

witness interviews with the witnesses to be called by the prosecution . . . ." Id.

Based upon these allegations, defendants alleged that "a conflict of interest

exist[ed] and [that]," pursuant to the Colorado Rules of Professional Conduct

cited in their motion, "Grundy's representation of the United States in this matter

require[d] her disqualification." Id.

Upon receiving the motion, the district court asked the lead prosecutor to

explain Grundy's "role in th[e] case." ROA, Vol. LVI, at 2195. The lead

prosecutor explained that Grundy

> ha[d] been assigned by the [BOP] to assist and manage witnesses and
> just general management of the trial and act as liaison to the
> prosecution team in order to make sure we get people in and out at
> the right times and assist with travel and documents and basically
> logistics for the most part. She is not hired by the U.S. Attorney's
> office. She is not a special assistant U.S. attorney.

Id. at 2195-96. In addition, the lead prosecutor stated that Grundy "was a general

counsel or assistant general counsel for the [BOP]" and "d[id]n't represent the

defendants." Id. at 2196. The district court stated it was "tempted to summarily

deny th[e motion] as late," but would instead first give the government a chance

to respond in writing. Id.

On April 28, 2003, the government filed its written response to defendants'

motion to disqualify Grundy. Id., Vol. V, Doc. 1120. Therein, the government

asserted that Grundy "[wa]s not a contract attorney for the United States Attorney

prosecuting the case at bar," but rather was "Counsel for the [BOP] and ha[d]

-4-

been facilitating the appearance of [BOP] staff at th[e] trial." Id. at 1. "As such," the government argued, Grundy's "presence in the court c[ould not] be equated with the representation of the United States in the prosecution of th[e] case." Id. Further, the government argued that "[i]n her role as Counsel for the [BOP]," Grundy "represented the [BOP] and not the employees of her agency." Id. at 2. Although the government acknowledged that Grundy acted as "a conduit through which [prison] employees obtained representation from the U.S. Department of Justice and United States Attorney's Office for civil suits filed against them in their official capacities," it asserted that such actions were "insufficient to create an attorney-client relationship" with the individual prison employees she assisted. Id. Relatedly, the government asserted that defense counsel were "already aware that civil attorneys from the U.S. Department of Justice and/or the United States Attorney's Office represented their clients in the various suits filed against them by inmates as they ha[d] already moved for notes and statements provided to these attorneys by their clients." Id. at 3. Lastly, the government asserted that "Grundy [wa]s not going to be called as a witness for the government" at trial. Id.

On April 28, 2003 (the same day the government filed its written response), the district court orally denied defendants' motion to disqualify Ms. Grundy. ROA, Vol. LX, at 3212. In doing so, the district court simply stated: "I find it to

-5-

be utterly without merit."[2]  Id.

## II.

In their opening appellate briefs, LaVallee and Schultz contend that the inclusion of Jenifer Grundy on the prosecution team was a clear conflict of interest. (LaVallee's Br. at 2, issue 3; and Schultz's Br. at 42, issue 5.)  Both LaVallee and Schultz have incorporated by reference the discussion of the Grundy issue contained in Verbickas' opening appellate brief.  Verbickas' brief, in turn, repeatedly emphasizes that each of the defendants, including LaVallee and Schultz, had an attorney-client relationship with Grundy.  In particular, Verbickas' brief states:

> • "The [district] court was made aware of the conflict presented by Grundy's representation of Pruyne, **LaVallee, Schultz** and Bond at the hearing held on July 11, 2001."  Verbickas' Br. at 28 (emphasis added).

> • "Grundy had an attorney-client relationship with **the Defendants** because of her position as legal counsel to the USP Florence employees.  During the investigation of this case, all Defendants worked as correctional officers at USP Florence.  As a result of their employment, numerous civil actions were filed by inmates alleging some of the Defendants violated their civil rights, including: *Turner v. Schultz, et al.*, 99-WM-2232 . . . .  These civil actions alleged so-called 'Bivens' violations against the Defendants and other correctional officers.  **LaVallee, Schultz** and Bond, three co-defendants in this trial, were named as Defendants in *Turner*."  Id. at 31 (emphasis added).

> • "Grundy represented Pruyne and **these Defendants** regarding their

---

[2] The government, in its appellate brief, asserts the district court denied the motion as untimely.  That assertion, however, is not supported by the record.

-6-

requests for DOJ representation.  She entered into an attorney-client relationship **with Defendants** and gathered relevant information regarding their requests to be afforded DOJ legal representation in these civil actions." <u>Id.</u> at 32 (emphasis added).

• "Grundy's relationship **with the Defendants** proved there were attorney-client relationships that subjected her to the ethical obligation of preserving confidential communications." <u>Id.</u> at 38 (emphasis added).

• "**The Defendants** looked to Grundy as **their** lawyer." <u>Id.</u> at 38 (emphasis added).

• "Grundy advised **Defendants**." <u>Id.</u> at 39 (emphasis added).

• "Grundy's prior relationship with **the Defendants** constitutes actual impropriety under Colorado law." <u>Id.</u> at 42.

In sum, the allegations in Verbickas' brief are sufficiently detailed to suggest the district court erred in denying LaVallee's and Schultz's motion to disqualify Grundy.

II.

We "review a district court's decision on a motion to disqualify counsel for abuse of discretion." <u>Chavez v. New Mexico</u>, 397 F.3d 826, 839 (10th Cir. 2005); <u>see</u> <u>United States v. Bolton</u>, 905 F.2d 319, 321 (10th Cir. 1990) (same).  "The merits of [a] disqualification motion depend on whether a substantial relationship exists between the pending suit and the matter in which the challenged attorney previously represented the client." <u>Bolton</u>, 905 F.2d at 321 (internal quotation marks omitted).

In reviewing the district court's ruling, the threshold question is whether an

-7-

attorney-client relationship existed between Grundy and either LaVallee or Schultz.  According to defendants' motion, a USP-Florence inmate named William Turner filed a federal civil action against LaVallee and Schultz (as well as defendant Bond) asserting they violated his constitutional rights by physically abusing him.  Although it is not entirely clear from the record, it appears that LaVallee and Schultz sought and received representation from the Department of Justice with respect to this civil action and, in doing so, worked at least initially with Grundy.  Based upon the testimony Grundy gave during the evidentiary hearing on defendant Gall's motion, it appears that she would have interviewed LaVallee and Schultz in order to obtain their version of events and, in turn, would have assisted them in obtaining representation from other DOJ attorneys.  As the supervisory attorney at USP-Florence, Grundy followed this general procedure when a USP-Florence employee sought DOJ representation after being sued by an inmate.  Assuming these facts are true (the government has never seriously disputed these facts), it appears that an attorney-client relationship did, in fact, exist between Grundy and these two defendants.  According to 28 C.F.R. § 50.15(a)(3), "[a]ttorneys employed by any component of the Department of Justice who participate in any process utilized for the purpose of determining whether the [DOJ] should provide representation  to a federal employee, undertake a full and traditional attorney-client relationship with the employee with respect to application of the attorney-client privilege."  This provision would

-8-

clearly encompass Grundy, since she allegedly "participate[d] in [the] process utilized" by the DOJ for determining whether it would provide representation to USP-Florence employees.

Assuming, then, that Grundy had an attorney-client relationship with LaVallee and Schultz regarding the William Turner lawsuit, the question then becomes whether, pursuant to the Colorado Rules of Professional Conduct cited by defendants in their original motion, that relationship barred Grundy from acting as a "liaison" to the DOJ attorneys prosecuting the defendants.

Defendants first cited to Rule 1.6(a), entitled *Confidentiality of Information*, which states:

> A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).

Applying that rule to the circumstances here, there is no evidence, and no express assertion by defendants, that Grundy revealed to the prosecution team any information that was provided to her by LaVallee or Schultz in connection with the civil suit filed against them by inmate Turner. Nor does it appear to be a reasonable assumption that, by simply coordinating BOP witnesses for the prosecution team, Grundy necessarily would have disclosed any such information. Thus, there is no basis for concluding that Grundy's role as "liaison" to the prosecution team resulted in a violation of Rule 1.6(a).

The second rule cited by defendants was Rule 1.9(a), entitled *Conflict of Interest: Former Client*, which states:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

Applying that rule to the circumstances present here, it appears, for the reasons already discussed, that Grundy likely had an attorney-client relationship with LaVallee and Schultz in connection with the civil lawsuit filed by inmate Turner. Further, as noted, that civil lawsuit was apparently based upon some of the same allegations of abuse as set forth in the superseding indictment. Thus, Rule 1.9(a) would have prohibited Grundy from representing any interests that were adverse to defendants LaVallee and Schultz. Based upon the information contained in the government's response to defendants' motion to disqualify Grundy, however, there is no indication that she ever acted as government counsel in these criminal proceedings. In other words, although defendants have characterized Grundy as a "member of the prosecution team," it appears that she, in fact, simply helped to coordinate BOP witnesses for the DOJ attorneys who represented the government in this case, and otherwise played no role in the investigation or prosecution of the charges against defendants. Thus, Rule 1.9(a) was not violated.[3]

---

[3] Even assuming, for purposes of argument, that Grundy could have been considered a member of the prosecution team, any resulting violation of Rule

(continued...)

-10-

Finally, defendants cited Rule 1.11, entitled *Successive Government and Private Employment*, which states, in pertinent part:

> (b) Except as law may otherwise expressly permit, a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. A firm with which that lawyer is associated may undertake or continue representation in the matter only if the disqualified lawyer is screened from any participation in the matter and is apportioned no part of the fee therefrom.
>
> * * *
>
> (e) As used in this Rule, the term "confidential government information" means information which has been obtained under governmental authority and which, at the time this rule is applied, the government is prohibited from disclosing to the public or has a legal privilege not to disclose, and which is not otherwise available to the public.

Clearly, this rule has no application here, since Grundy has continuously worked for the BOP and has never worked in private practice representing a private client.

In sum, I conclude there was no merit to defendants' motion to disqualify Grundy, and thus the district court did not abuse its discretion in denying that

---

[3](...continued)
1.9(a) was harmless. In particular, the jury acquitted defendants LaVallee and Schultz of the substantive charge that alleged the beating of inmate William Turner. Further, LaVallee's and Schultz's conspiracy convictions rested upon their role in beating inmate Pedro Castillo and then concealing evidence of that beating.

-11-

motion.