# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

    Plaintiff - Appellant/Cross-Appellee,

  v.

ROBERT VERBICKAS; ROD SCHULTZ; MIKE LAVALLEE,

    Defendants - Appellees/Cross-Appellants.

Nos.  04-1000
       03-1515
       03-1522
       03-1523

A true copy
Teste

Elisabeth A. Shumaker
Clerk, U.S. Court of
Appeals, Tenth Circuit
By
Deputy Clerk

## JUDGMENT

Filed February 28, 2006

Before **TACHA**, Chief Circuit Judge, **BRISCOE** and **LUCERO**, Circuit Judges.

This case originated in the District of Colorado and was argued by counsel.

The judgment of that court is affirmed.

Entered for the Court
CLERK, COURT OF APPEALS

by:
Deputy Clerk

**F I L E D**
United States Court of Appeals
Tenth Circuit

February 28, 2006

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee/Cross-
      Appellant,

v.

MIKE LAVALLEE, ROD SCHULTZ,
and ROBERT VERBICKAS,

      Defendants-Appellants/Cross-
      Appellees.

Nos. 03-1515, 03-1522, 03-1523,
04-1000, 04-1538, 04-1540

---

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
## (D. Ct. No. 00-CR-481-D)

---

Brian K. Holland, Holland & Pagliuca, P.C., Denver, Colorado, appearing for
Appellant/Cross-Appellee Verbickas.

Richard A. Hostetler, Law Office of Richard A. Hostetler, Denver, Colorado,
appearing for Appellant/Cross-Appellee LaVallee.

Neil McFarlane, Denver, Colorado, appearing for Appellant/Cross-Appellee
Schultz.

Karl N. Gellert, Attorney (R. Alexander Acosta, Assistant Attorney General,
Bradley J. Schlozman, Acting Assistant Attorney General, and Jessica Dunsay
Silver, Attorney, with him on the briefs), United States Department of Justice,
Washington, DC, appearing for Appellee/Cross-Appellant United States.

---

Before **TACHA**, Chief Circuit Judge, **BRISCOE,** and **LUCERO**, Circuit Judges.

**TACHA,** Chief Circuit Judge.

This appeal relates to a three-year investigation of inmate abuse at the United States Penitentiary in Florence, Colorado ("USP-Florence"), that resulted in charges against ten former correctional officers for conspiracy and deprivation of inmates' constitutional rights in violation of 18 U.S.C. §§ 241 and 242. Following a jury trial, two correctional officers, Michael LaVallee and Rod Schultz, were found guilty of both offenses, and Robert Verbickas was found guilty of the substantive deprivation charge. All three men (collectively, "Appellants") appeal both their convictions and sentences. The Government cross-appeals their sentences. Mr. Schultz also appeals the District Court's denial of a motion for a new trial based on newly discovered evidence and the Government's suppression of evidence in violation of *Brady v. Maryland.* We have consolidated all five cases for disposition on appeal. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. BACKGROUND

Beginning in 1997, the Government began investigating allegations of the widespread abuse of prisoners and the falsification of records to cover up that abuse at USP-Florence. As a result of the investigation, eight Bureau of Prisons ("BOP") correctional officers were indicted and two were charged by information. Three officers—Dennis Britt, Charlotte Gutierrez, and Kenneth Mitchell—pleaded

guilty and cooperated with the Government by providing testimony at trial.

The seven remaining defendants, including Appellants, were charged in a ten-count superceding indictment on February 6, 2001. All seven were named in Count I, which alleged a vast conspiracy of abuse and cover-up, in violation of 18 U.S.C. § 241. The remaining nine counts charged certain defendants with excessive force against individually named inmates in violation of the inmates' Eighth Amendment right to be free from cruel and unusual punishment. *See* 18 U.S.C. § 242.

At trial, the Government sought to establish a vast conspiracy to abuse inmates. Throughout trial, the Government maintained a "green light" theory in which it alleged that Captain Terry Hines had given the defendants the "green light to take care of business" with certain inmates in the Special Housing Unit[1] ("SHU") who were aggressive toward the prison staff. Several correctional officers testified that they understood this to mean that they were to abuse inmates to let them know that aggression against prison staff would not be tolerated. Although not all supervisors were tolerant of the wrongful conduct, some supervisors were.

Standard procedure at the SHU for any use of force required the officers to document the incident through memoranda. Additionally, any time there was a

---

[1]The SHU is the prison unit that prisoners were sent to if they had disciplinary problems or were otherwise being punished through administrative segregation.

-3-

planned use of force, the incident was generally videotaped. The tapes were designed to ensure that the officers acted in accordance with the BOP's "Use of Force Policy."

Accordingly, in support of its conspiracy theory under 18 U.S.C. § 241, the Government presented a case at trial that detailed the officers' agreements to provide false reports and fabricate injuries to themselves when they violated the BOP's Use of Force Policy by beating inmates unjustifiably. They presented testimony that several officers created an atmosphere that not only tolerated abuse of inmates, but encouraged it. The Government maintained that, in addition to conspiring to do so, the officers in fact violated inmates' civil rights through beatings and assaults. The facts of the incidents giving rise to the Appellants' assault convictions under 18 U.S.C. § 242 are as follows.

A.    The Howard Lane Assault

Testimony at trial demonstrated that Howard Lane, a USP-Florence prisoner, wrote several letters containing sexually explicit remarks to a female USP-Florence officer. After the discovery of the letters, Mr. Verbickas escorted Mr. Lane to Captain Hines's office, where the Captain told Mr. Verbickas and Mr. Britt to "take this piece of shit down to SHU and give him a treatment." Mr. Verbickas and Mr. Britt applied restraints to Mr. Lane's wrists and took him to the SHU. As he was led to the SHU, Mr. Lane threatened the officers and struggled against the restraints. When the trio arrived at the SHU, Ms. Gutierrez

-4-

opened a cell door as the other officers escorted Mr. Lane inside.  Mr. Britt returned to the officers' station.

Ms. Gutierrez testified that she saw Mr. Verbickas punch Mr. Lane while he was standing against the wall of the cell, his hands still restrained behind his back.  She further stated that Mr. Verbickas then placed him on the floor and that she kicked him in the ribs so as to avoid leaving visible injuries and the concomitant need to file an incident report.  Mr. Verbickas then grabbed Mr. Lane by his collar and the seat of his pants, lifted him waist high, and dropped him on his face.  Blood oozed from Mr. Lane's lip.  Finally, Mr. Verbickas threw Mr. Lane up against the wall, leaving a blood stain.

Because Mr. Lane suffered visible facial injuries as a result of the beating, the officers discussed how they would falsify their incident reports to avoid an investigation.  The reports ultimately filed with USP-Florence stated that Mr. Lane kicked both Mr. Verbickas and Ms. Gutierrez, and Mr. Lane threw himself up against the wall.  To support this version of events, Ms. Gutierrez testified that she inflicted an injury on herself.

B.     The Pedro Castillo Assault

Pedro Castillo, another inmate in the SHU, was an orderly in that unit and responsible for cleaning as directed by the officers.  During an argument with Ms. Gutierrez on the morning of April 5, 1996, Mr. Castillo threw a mop and bucket of water onto the floor.  Because of this, Mr. Castillo lost his job as an orderly as

-5-

well as the freedom associated with the job; he was forced to return to 23-hour lockdown.

The Government presented evidence at trial that later that day, several officers met to discuss how they would further punish Mr. Castillo for his behavior that morning. According to the Government, the officers resolved to concoct a story that Mr. Castillo was cutting himself—he was a known self-mutilator—which would require them to perform a forced-cell move. The officers assigned roles to each other in the ensuing assault. Because a video camera was perched outside Mr. Castillo's cell, Mr. Schultz's role in the assault was to knock the camera over so that it would not record the officers entering the cell. After doing so, several officers entered the cell, pulled Mr. Castillo off his top bunk, put him on the floor, and restrained him with handcuffs. Additional testimony demonstrated that the officers then took Mr. Castillo to a holding cell where Mr. Schultz and Mr. LaVallee each struck him two or three times in the back with their fists while Mr. Mitchell held Mr. Castillo against the wall. Mr. Mitchell then released Mr. Castillo and walked back to the officers' station approximately twenty feet away; he could hear the sound of the blows as the officers continued to beat Mr. Castillo. Ms. Gutierrez then entered the cell and Mr. LaVallee told her to kick Mr. Castillo, which she did. After the assault, Mr. LaVallee told Ms. Gutierrez that they had beaten Mr. Castillo on her behalf.

Following the incident, the officers again fabricated false reports to justify

-6-

the forced-cell move.  The officers reported that Mr. Castillo had been cutting himself and that when the officers entered the cell to subdue him, Mr. Schultz slipped and knocked down the camera.  The reports also stated that once the officers were inside the cell, Mr. Castillo punched one of them in the head.  None of the reports mentioned that Mr. Castillo was beaten.

Mr. Verbickas was charged with one count of conspiracy to violate inmates' civil rights and three substantive assault counts regarding individual inmates.  Mr. Schultz and Mr. LaVallee were also charged with conspiracy.  Additionally, Mr. Schultz was charged with three substantive assault counts and Mr. LaVallee was charged with four.  Following approximately eight weeks of testimony and two weeks of jury deliberations, Mr. Verbickas was convicted on one count of using excessive force against Mr. Lane and was sentenced to 30 months' imprisonment.  Both Mr. Schultz and Mr. LaVallee were convicted on the conspiracy charge and the substantive assault charge involving Mr. Castillo.  The District Court sentenced them to 41 months' imprisonment.  This appeal followed.[2]

In Mr. Verbickas's opening brief, he raises four issues that he claims warrant reversal of his conviction.  Mr. LaVallee and Mr. Schultz incorporated these claims by reference into their briefs on appeal.  We will therefore address

---

[2]The four remaining defendants—James Bond, Brent Gall, David Pruyne, and Ken Shatto—were acquitted on all counts and, accordingly, are not parties to these appeals.

these issues first, as they apply to all the Appellants. We will then address Mr. LaVallee's and Mr. Schultz's additional claims of error in their convictions. Finally, we will address all sentencing issues including the Appellants' claimed errors under *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) and the Government's cross-appeal contesting the District Court's failure to apply an enhancement for obstruction of justice and its discretionary decision to depart downward from the applicable Guidelines range.

## III. COMMON ISSUES

A.    Bureau of Prisons Attorney on Prosecution Team

Jenifer Grundy served as a supervisory attorney for the BOP at USP-Florence from November 1992 to April 2002. In that position, she was responsible for providing legal services to the facility as well as to correctional officers who were accused by inmates of constitutional violations in *Bivens* actions. *See* 28 C.F.R. § 50.15 (providing legal representation to federal employees in actions arising out of performance of their official duties). When an officer would make a request for representation, Ms. Grundy would take the officer's statement and then submit it to the Department of Justice ("DOJ"). The DOJ would determine whether representation was warranted.

Prior to trial, several of the defendants in this case had *Bivens* actions filed against them. Relevant to this case, Mr. LaVallee, Mr. Schultz, and David Pruyne were each named in several actions. According to the Appellants, some of the

-8-

defendants contacted Ms. Grundy to obtain DOJ representation in the actions against them.

Later, in connection with the instant case, Ms. Grundy contacted Mr. Pruyne and another of the acquitted defendants, Brent Gall, and requested that they speak with DOJ attorney Mark Blumberg—one of the Government's prosecutors in this case—and an FBI agent. She did not represent either Mr. Pruyne or Mr. Gall at their interviews. During the interviews, Mr. Pruyne and Mr. Gall were allegedly advised that they were the targets of an investigation involving the abuse of inmates.[3]

On April 21, 2003, ten days into trial, it became apparent to the defendants, including Messrs. LaVallee, Schultz, and Verbickas, that Ms. Grundy was acting with the Government as part of the prosecution against them. They filed a joint motion to disqualify her,[4] alleging violations of Rules 1.9, 1.11 and 1.6(a) of the

---

[3]For various reasons, the substance of these interviews later became the subject of two motions to suppress. The District Court denied Mr. Pruyne's motion to suppress as moot after Mr. Pruyne's counsel withdrew it. The District Court denied Mr. Gall's motion to suppress because, *inter alia*, there was no evidence that Mr. Gall believed that he had established an attorney-client relationship with Ms. Grundy.

[4]If this motion was untimely, our review would be severely limited, and subject only to plain error review. *United States v. Stiger*, 413 F.3d 1185, 1195 n.5 (10th Cir. 2004). It is not clear, however, that the facts giving rise to the motion to disqualify were known to the defendants before it was made. Thus, we decline to apply plain error analysis to this claim.

Colorado Rules of Professional Conduct.[5]  Counsel for the Government responded

that Ms. Grundy's only role in the case was to "assist and manage witnesses and

just general management of the trial."  The Government further explained that she

had not been hired by the U.S. Attorney's Office, nor was she acting as a special

assistant to the U.S. Attorney.  The defendants presented evidence, however, that

Ms. Grundy was acting as a "Special AUSA" and was participating in witness

---

[5]Rule 1.9 states: "A lawyer who has formerly represented a client in a
matter shall not thereafter represent another person in the same or a substantially
related matter in which that person's interests are materially adverse to the
interests of the former client unless the former client consents after consultation."
Rule 1.11(b), (e), which relate to successive government and private employment,
provide:

> (b) Except as law may otherwise expressly permit, a lawyer having
> information that the lawyer knows is confidential government
> information about a person acquired when the lawyer was a public
> officer or employee, may not represent a private client whose
> interests are adverse to that person in a matter in which the
> information could be used to the material disadvantage of that
> person. A firm with which that lawyer is associated may undertake or
> continue representation in the matter only if the disqualified lawyer
> is screened from any participation in the matter and is apportioned no
> part of the fee therefrom.
> . . .
> (e) As used in this Rule, the Term "confidential government
> information" means information which has been obtained under
> governmental authority and which, at the time this rule is applied, the
> government is prohibited by law from disclosing to the public or has
> a legal privilege not to disclose, and which is not otherwise available
> to the public.

Under Rule 1.6(a), "[a] lawyer shall not reveal information relating to
representation of a client unless the client consents after consultation, except for
disclosures that are impliedly authorized in order to carry out the representation."

interviews.  Before ruling on the motion for disqualification, the District Court

ordered the Government to submit a written response and then denied the motion

to disqualify as "utterly without merit."

The Appellants claim that Ms. Grundy's participation on the prosecution

team violated their constitutional right to a fair trial.  Indeed, "[a] fair trial in a

fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S.

133, 136 (1955).  "The right to due process and a fair trial include the essential

element that there is no unfair advantage to the prosecution by reason of a prior

professional relationship between a member of its staff and a criminal defendant

concerning the same or closely related matter." *State v. Boyd*, 560 S.W.2d 296,

298–99 (Mo. Ct. App. 1977) (quotation omitted).  "[D]ue process is violated

when an attorney represents a client and then participates in the prosecution of

that client with respect to the same matter." *United States v. Schell*, 775 F.2d

559, 566 (4th Cir. 1985).

In order to determine whether disqualification of counsel is warranted

because of prior representation, we ordinarily undertake a three-part inquiry in

which we ask whether "(1) an actual attorney-client relationship existed between

the moving party and the opposing counsel; (2) the present litigation involves a

matter that is substantially related to the subject of the movant's prior

representation; and (3) the interests of the opposing counsel's present client are

materially adverse to the movant." *United States v. Stiger*, 413 F.3d 1185, 1196

-11-

(10th Cir. 2005) (quotations and citation omitted).  If the moving party makes a

non-frivolous allegation that he has had an attorney-client relationship in a

substantially related matter, a district court must investigate the allegation further

through an evidentiary hearing before denying a motion to disqualify.  *Id.*  Failure

to do so constitutes an abuse of discretion.  *Id.*

     Here, the District Court concluded that the motion to disqualify Ms.

Grundy for violations of the Colorado Rules of Professional Conduct was

frivolous.  Indeed, it explicitly stated that the motion was "utterly without merit."

On appeal, Mssrs. LaVallee and Schultz proffer no argument to suggest that the

District Court erred in concluding that Ms. Grundy violated the rules with respect

to any former relationship she may have had with them.  The only reference to a

relationship between the Appellants and Ms. Grundy is the following:

> [S]o-called "Bivens" violations [were filed] against the Defendants
> and other correctional officers.  LaVallee, Schultz and Bond . . . were
> named as Defendants in *Turner*.  Pruyne was named as a defendant in
> *Bryant, Collins,* and *Verdecia.*  Pruyne and other Defendants sought
> legal representation from the . . . DOJ . . . .  Grundy represented
> Pruyne and these Defendants regarding their requests for DOJ
> representation.  She entered into an attorney-client relationship with
> Defendants and gathered relevant information regarding their
> requests to be afforded DOJ legal representation in these civil
> actions.

Based on this conclusory argument, we cannot conclude that District Court erred

in finding Mr. LaVallee's and Mr. Schultz's argument frivolous.  In fact, neither

Appellant ever averred that he actually spoke with Ms. Grundy.  At the District

Court level, the factual basis for Mr. Schultz's claim—which the District Court rejected—amounted to an assertion that "[u]pon information and belief statements were given to Ms. Grundy and or a representative of the U.S. Government." We therefore find no abuse of discretion in the District Court's conclusion on this point.

Nonetheless, the Appellants argue that the court erred because it failed to conduct an evidentiary hearing to determine the extent of Ms. Grundy's attorney-client relationship with Mr. Pruyne and Mr. Gall. Although the record shows that the court had already determined that no attorney-client relationship existed with respect to Mr. Gall, the same cannot be said with respect to Mr. Pruyne. Even so, we need not decide whether the District Court erred in failing to hold an evidentiary hearing. Both Mr. Gall and Mr. Pruyne were acquitted of the charges against them and therefore are not parties to this appeal.

The remaining issue, then, is whether the three Appellants were denied a fair trial because Ms. Grundy purportedly obtained privileged information through her alleged prior representation of the Appellants' codefendants Messrs. Gall and Pruyne such that the prosecution had an unfair advantage in obtaining the Appellants' convictions. The Fourth Circuit confronted similar circumstances in *United States v. Schell*, 775 F.2d 559.

*Schell* involved the indictment of thirty-nine individuals for numerous crimes, including conspiracy to distribute controlled substances in violation of 21

-13-

U.S.C. § 846. During the investigation of the crimes, three individuals under investigation sought representation from an attorney, David Jividen. *Id.* at 562–63. Mr. Jividen represented them when they appeared before the third grand jury in the matter. *Id.* at 562. Several months later, Mr. Jividen became employed as an Assistant United States Attorney in the district in which the appellants were later indicted. *Id.* at 562. In his role as a U.S. Attorney, he appeared before the fourth grand jury leading up to the indictments. *Id.* at 563. After the grand jury returned its indictment, Mr. Jividen no longer participated in the prosecution of his former clients nor participated in any proceeding in which his former clients were witnesses or potential witnesses. *Id.* at 564. All three of his clients, along with thirty-five coconspirators, were convicted. *Id.*

On appeal, two of Mr. Jividen's former clients and two of their coconspirators appealed their convictions, arguing that Mr. Jividen's appearance before the fourth grand jury violated their due process rights and was per se prejudicial. *Id.* at 564–65. The Fourth Circuit stated:

> The relationship between an attorney and his client is a sacred one. In that relationship, the client must be secure in the knowledge that any information he reveals to counsel will remain confidential. The confidentiality of the attorney-client relationship is severely compromised, if not destroyed, when, after representing a client, a lawyer joins in the criminal prosecution of that client with respect to the identical matter about which the attorney originally counseled the client. Such switching of sides is fundamentally unfair and inherently prejudicial. Without question, the client's right to a fair trial, secured by the due process clauses of the fifth and fourteenth amendments, is compromised under these circumstances.

-14-

*Id.* at 565 (emphasis omitted). It therefore reversed the convictions of Mr. Jividen's former clients. *Id.* at 566. In so concluding, however, the court refused to find constitutional error with respect to the appellants who had established no attorney-client relationship with Mr. Jividen and who had not demonstrated that Mr. Jividen's former clients had imparted to him confidential information regarding them. *Id.* at 566.

Similarly, in *McFarlan v. District Court*, the Supreme Court of Colorado held that a prosecutor is not automatically disqualified from prosecuting an accused because of a prior attorney-client relationship with a codefendant of the accused. 718 P.2d 247, 250 (Colo. 1986) (listing cases). It identified two factors to consider in determining whether to disqualify a prosecutor in such a case: (1) whether the accused had an attorney-client relationship with the prosecutor; and (2) whether there is any evidence that the prosecutor actually received confidential information from or about the accused. *Id.*

Here, the Appellants make only conclusory allegations that they had an attorney-client relationship with Ms. Grundy. There is no evidence that Mr. Pruyne or any defendant imparted confidential information to Ms. Grundy regarding the Appellants. Mr. Pruyne applied for and obtained DOJ representation for the three *Bivens* actions filed against him prior to the prosecution of the instant case. There is no evidence to suggest that Mr. Pruyne

-15-

communicated confidential information to Ms. Grundy on any topic other than the

subject of those *Bivens* actions.  The three inmates who filed those suits were not

victims of the conspiracy alleged in the indictment against the Appellants.  In

other words, the Appellants have failed to establish that they were in any way

prejudiced by Ms. Grundy's participation in their prosecution.  We therefore hold

that the Appellants suffered no constitutional defect in their trials.[6]

B.    Jury Instructions

The Appellants raise several claims of error with respect to the instructions

given to the jury.  First, they argue that the District Court erred in instructing the

jury on the elements of both the conspiracy and substantive offenses.  We review

jury instructions in their entirety under a de novo standard of review.  *United*

*States v. Laughlin*, 26 F.3d 1523, 1528 (10th Cir. 1994).  "In so doing, we

analyze, in light of the record, whether the instructions state the governing law

and whether the jury was provided an intelligent, meaningful understanding of the

applicable issues and standards."  *Id.*  We will reverse only if we have

"substantial doubt that the jury was fairly guided."  *United States v. Smith*, 13

F.3d 1421, 1424 (10th Cir. 1994) (quotation omitted).  Where no objection was

---

[6]To echo the words of *United States v. Bolton*, 905 F.2d 319, 322 (10th Cir. 1990), "[w]e cannot fathom the obdurate persistence of the prosecution in keeping [Ms. Grundy] on this case.  The decision, in the face of objection . . . is, to say the least, aberrant.  The exercise of a modicum of prudence on the part of the prosecutor would have made consideration of this issue on appeal completely unnecessary."

-16-

made below, however, we review only for plain error. *United States v. Ellzey*, 936 F.2d 492, 500 (10th Cir. 1991).

     1.    *18 U.S.C. § 241: Conspiracy Against Rights*

    18 U.S.C. § 241 prohibits two or more people from conspiring "to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same." After reading the statute to the jury, the District Court instructed it that there were four necessary elements to prove conspiracy. Instruction No. 33 stated in part:

| | |
|---|---|
| ONE: | The defendant whose case you are considering entered into a conspiracy with one or more persons to injure, oppress, threaten or intimidate inmates. |
| TWO: | The conspiracy was directed at the deprivation of a right which is secured or protected by the Constitution or laws of the United States, here, the right not to be subjected to cruel and unusual punishment. |
| THREE: | The defendant acted willfully to deprive inmates of such right. |
| FOUR: | The defendant acted under color of law. |

If you should find from your consideration of all the evidence as to each defendant that any of these elements has not been proved . . . beyond a reasonable doubt, then you should find the defendant not guilty.

    The District Court then elaborated on each element of the crime. Four subsequent instructions expanded upon the first element and described what it meant to be part of a conspiracy. In addition, Instruction No. 39 informed the

-17-

jury that the words "injure," "oppress," "threaten," or "intimidate," "are not used in any technical sense but may cover a variety of conduct intended to harm, frighten, prevent, or punish the free action of other persons."

Instruction No. 40 elaborated on the second element—that the conspiracy must be directed at the deprivation of the constitutional right to be free from cruel and unusual punishment. It provided that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment" and whether the action taken by the defendant amounts to such conduct "turns on whether the force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." It further provided that "[f]actors to be considered in making the determination include the extent of injury suffered by an inmate, the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the person using force on the inmate, and any efforts made to temper the severity of a forceful response."

Messrs. LaVallee and Schultz[7] argue that use of certain statutory language in the above instructions is inconsistent with and dilutes the constitutional standard for determining whether there has been a conspiracy to deprive an inmate of his Eighth Amendment rights. Specifically, they argue that the words

---

[7]Only Mr. LaVallee and Mr. Schultz complain of the 18 U.S.C. § 241 instruction; Mr. Verbickas was not convicted on that charge.

-18-

"injure, oppress, threaten, or intimidate," which appear in 18 U.S.C. § 241 and Instructions Nos. 33 and 39, allowed a reasonable jury to infer that something less than the "unnecessary and wanton infliction of pain" is sufficient to convict, which is inconsistent with *Hudson v. McMillan*, 503 U.S. 1 (1992). In other words, their argument is that the language confused the jury and permitted it to convict based on a finding that a defendant conspired to threaten or intimidate inmates, not that he conspired to violate their Eighth Amendment rights. *Cf. United States v. Kozminski*, 487 U.S. 931 (1988) (reversing convictions because instruction alleging conspiracy to deprive individuals of their Thirteenth Amendment right to be free from involuntary servitude pursuant to 18 U.S.C. § 241 allowed for conviction based upon psychological coercion which is not prohibited by the Thirteenth Amendment or the statute enacted to enforce it).

After reviewing the jury instructions in their entirety, it is clear that a jury could not convict on the conspiracy charge unless it found that the conspiracy was directed at depriving the inmates of their Eighth Amendment right. Instruction No. 33 provided that if the Government did not prove "any of these elements" it must find the defendant under consideration not guilty. *See United States v. Almaraz*, 306 F.3d 1031, 1037 (10th Cir. 2002) (stating that the court presumes "jurors attend closely to the language of instructions in a criminal case and follow the instructions given to them"). The same instruction provided that the conspiracy to injure, oppress, threaten, or intimidate must be "directed at the

-19-

deprivation of a right which is secured or protected by the Constitution or laws of the United States, here, the right not to be subjected to cruel and unusual punishment." Further, Instruction No. 40 correctly prescribed the scope of protection under the Eighth Amendment, stating that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment." *Hudson*, 503 U.S. at 5 (quotations, alteration, and citations omitted); *see also Kozminski*, 487 U.S. at 952–53 (holding that for purposes of prosecution under § 241 for subjecting an individual to involuntary servitude, the jury must be instructed that involuntary servitude is the compulsion of services by the use or threatened use of physical or legal coercion). Instruction No. 39 merely elaborated on the first element—that is, what it meant to be involved in a conspiracy. After reaching a conclusion on that element of the crime, the jury *also* had to conclude that the object of the conspiracy was to deprive an inmate of his Eighth Amendment right, as defined by the instructions. That the individual instructions explaining the language "injure, oppress, threaten or intimidate" did not explicitly reference the scope of the constitutional right at issue did not confuse the jury as to their task. Rather, as the District Court found, the approach was designed to minimize confusion. The court stated, "What you're really asking me to do is to put in every instruction everything that's in every other instruction so the instructions would in effect be so confusing that no one would ever understand what they mean, and I reject that." We agree. The instructions were consistent with the legal standard

-20-

for conspiracy to deprive a person of his Eight Amendment right.

    2.    *18 U.S.C. § 242: Deprivation of Rights Under Color of Law*

    18 U.S.C. § 242 prohibits a person acting "under color of any law, statute,

ordinance, regulation, or custom, [to] willfully subject[] any person in any State,

Territory, Commonwealth, Possession, or District to the deprivation of any rights,

privileges, or immunities secured or protected by the Constitution or laws of the

United States." After reading the statute to the jury, the District Court instructed

it that there were four necessary elements to prove the deprivation of rights under

§ 242. Instruction No. 47 stated:

| | |
|---|---|
| ONE: | The defendant whose case you are considering deprived an inmate or inmates of a right which is secured or protected by the Constitution of the United States; namely the right not to be subjected to cruel and unusual punishment; |
| TWO: | The defendant acted willfully to deprive the inmate of such right; |
| THREE: | The defendant acted under the color of law; |
| FOUR: | The inmate suffered bodily injury as a result of the defendant's conduct. |

    The Appellants first complain that the District Court did not include a

cautionary instruction that the de minimis use of physical force does not

constitute cruel and unusual punishment in violation of the Eighth Amendment.

The Appellants did not raise this objection to the District Court, and accordingly

we review only for plain error.

    In *Hudson*, the Supreme Court established that a de minimis use of force,

unless it is of a sort "repugnant to the conscience of mankind," does not violate the Eighth Amendment's prohibition of cruel and unusual punishment. 503 U.S. at 9–10 (quotation omitted). Though the jury instructions did not make this fact clear, the Appellants have failed to establish plain error. First, Instruction No. 40, described above, helps to resolve any confusion regarding the proof needed to establish a violation of § 242. It provided that "the unnecessary and wanton infliction of pain constitutes cruel and unusual punishment" and that the jury should consider the relationship between the amount of force used and the need for such force. This instruction tends to exclude the possibility of a conviction based on a de minimis use of force. Second, there was no dispute at trial about whether the force used by the Appellants was de minimis. To the contrary, the Government presented evidence that Mr. LaVallee and Mr. Schultz punched Mr. Castillo in the back numerous times while he was restrained and compliant; Mr. Mitchell testified that the sound of the blows could be heard in another room fifteen to twenty feet away. The Government also presented evidence that Mr. Verbickas punched Mr. Lane while he was restrained and compliant, then picked him up off the floor waist-high and dropped him on his face, causing blood to spill from his lip. The Appellants never challenged this testimony on the basis that the force applied was de minimis; rather, they argued that they did not commit the acts at all. On this evidence, there was no occasion for the jury to consider whether the force used was de minimis. Thus the District Court did not

-22-

plainly err in failing to give such an instruction sua sponte.

Next, the Appellants claim that the jury instructions permitted the jury to convict if it found that the inmates suffered only de minimis injuries which, they argue, is prohibited by the "unnecessary and wanton infliction of pain" standard set forth in *Hudson*. Section 242 makes "it criminal to act (1) 'willfully' and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States." *Lanier v. United States*, 520 U.S. 259, 264 (1997). If these elements are met, and if bodily injury (but not death) results from the willful deprivation of the constitutional right, the defendant is subject to a sentencing enhancement of up to ten years. 18 U.S.C. § 242. The Appellants argue that the Eighth Amendment is not violated if the inmates only suffered de minimis injuries. As such, they claim that Instruction No. 48, which defined "bodily injury" for purposes of the sentencing enhancement as "(1) a cut, abrasion, bruise, burn, or disfigurement; (2) physical pain; (3) illness; (4) impairment of the function of a bodily member, organ, or mental faculty; or (5) any other injury to the body no matter how temporary," misled the jury and allowed them to convict if they found merely de minimis injuries, such as a small cut or exceedingly temporary injury.[8]

---

[8]The Appellants do not argue that "bodily injury" as defined in Instruction No. 48 was a misstatement of the law as it applies to the sentencing enhancement. Nor do they dispute that bodily injury resulted.

-23-

*Hudson* explained that "the extent of injury suffered by an inmate is [but] one factor that may suggest" whether the force applied was necessary or wanton, *id.* at 7, and the Court explicitly rejected a requirement that inmates show a "significant injury" to state a claim for excessive force in violation of the Eighth Amendment. *Id* at 5. Several circuits have held, however, that there has been no excessive force in violation of the Eighth Amendment when an inmate suffers only de minimis injuries. *See, e.g., Siglar v. Hightower*, 112 F.3d 191, 193 (5th Cir. 1997); *Norman v. Taylor*, 25 F.3d 1259, 1263 (4th Cir. 1994) (en banc). Those courts draw a negative inference from the statement in *Hudson* that "the blows directed at Hudson, which caused bruises, swelling, loosened teeth, and a cracked dental plate, are not de minimis for Eighth Amendment purposes. The extent of Hudson's injuries thus provides no basis for dismissal of his § 1983 claim." *Norman*, 25 F.3d at 1262 (quoting *Hudson*, 503 U.S. at 10). In other words, they infer from this statement that merely "de minimis injury can serve as conclusive evidence that de minimis force was used." *Id.* We reject this view.

In *Hudson*, the Court explained:

> In the excessive force context, . . . [w]hen prison officials
> maliciously and sadistically use force to cause harm, contemporary
> standards of decency always are violated. This is true whether or not
> significant injury is evident. Otherwise, the Eighth Amendment
> would permit any physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury. Such
> a result would have been as unacceptable to the drafters of the Eighth
> Amendment as it is today.

503 U.S. at 9 (internal citations omitted).  It further explained that in determining whether the use of force was wanton and unnecessary,

> it may also be proper to evaluate the need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and "any efforts to temper the severity of a forceful response." *The absence of a significant injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.*

*Id.* at 7 (quotations omitted) (emphasis added).

Therefore, we agree with the Third Circuit that in *Hudson*, the Supreme Court evidenced its "commit[ment] to an Eighth Amendment which protects against cruel and unusual force, not merely cruel and unusual force that results in sufficient injury." *Brooks v. Kyler*, 204 F.3d 102, 108 (3d Cir. 2000) (emphasis omitted); *see also Hudson*, 503 U.S. at 13 (Blackmun, J., concurring) (stating that "[t]he Court today appropriately puts to rest a seriously misguided view that pain inflicted by an excessive use of force is actionable under the Eighth Amendment only when coupled with 'significant injury,' e.g., injury that requires medical attention or leaves permanent marks."). A contrary holding would mean that "a prisoner could constitutionally be attacked for the sole purpose of causing pain as long as the blows were inflicted in a manner that resulted in visible (or palpable or diagnosable) injuries that were de minimis." *Brooks*, 204 F.3d 108.  We therefore hold that the government need not prove that an individual suffered a certain level or type of injury to establish excessive force in violation of the Eighth Amendment and 18 U.S.C. § 242.

-25-

In so holding, we recognize that the degree of injury may be highly relevant to the determination of the unreasonableness of the force used. But we decline to adopt a rule today, which we believe would be inconsistent with *Hudson*, that permits an officer to beat an inmate so long as the resulting injuries are neither permanent nor require medical attention. Accordingly, we conclude that the jury instructions did not mislead the jury as to the applicable law.

3.   *Supplemental Instruction*

After approximately eight weeks of testimony, the case was submitted to the jury. The jury deliberated for ten days, at which point the district court judge called the jury into the courtroom and reread Instruction No. 29, which provided in relevant part:

> A separate crime is alleged in each count of the indictment. Under these instructions, you may find that [sic] one or more of the defendants guilty or not guilty as charged. At any time during deliberations, you may return into court with your verdict of guilty or not guilty as to any defendant concerning whom you have unanimously agreed.

The court went on to state:

> What I'm ordering you to do is to the extent, consistent with Instruction No. 29 and all of the other instructions that you have received and presumably read, if you have reached a verdict of either guilty or not guilty as to the defendant, I'm ordering you to put that verdict, if you've reached it, into an envelope, and we will seal that envelope and . . . write the words ["]this is the verdict for defendant blank["] and then each of you would then sign the envelope and . . . return[] [it] to Mr. Keech [the courtroom deputy] for safekeeping. It will not be returned to me because I don't want to see it.

-26-

> And so that's what I'm directing you to do. And I want to reiterate, I
> want you to do that only if . . . you have reached a verdict of guilty
> or not guilty as to any defendant concerning whom you have
> unanimously agreed.
>
> If you have not reached a unanimous agreement, then you don't have
> to do anything. And if you have reached a unanimous agreement,
> then I'm instructing you to do what I just said.

The jury sealed five verdicts in envelopes that day, including the guilty verdict as

to Mr. Verbickas, and two more verdicts after several hours of deliberation the

following day, including the guilty verdicts as to Messrs. Schultz and LaVallee.

The Appellants argue that this instruction is error for two reasons. First,

they argue that it is an *Allen* charge[9] that impermissibly coerced the jury's

verdicts. Second, they argue that the District Court abused its discretion by

instructing the jury to return partial verdicts as it improperly invaded the province

of the jury regarding how it conducted deliberations. We address each argument

in turn.[10]

      a.    *Allen* Charge

An *Allen* charge is "a supplemental instruction given to the jury and

designed to encourage a divided jury to agree on a verdict." *United States v.*

---

[9]*See Allen v. United States*, 164 U.S. 492 (1896).

[10]To the extent that the Appellants argue that the supplemental instruction
should not have been given at all, we find that the District Court, concerned about
the length of deliberations, did not abuse its discretion in so doing. *See United
States v. McElhiney*, 275 F.3d 928, 940 (10th Cir. 2001) (stating that whether to
give an instruction at all is within the sound discretion of the trial court).

*Zabriskie*, 415 F.3d 1139, 1147 (10th Cir. 2005). When an *Allen* charge "imposes such pressure on the jury such that the accuracy and integrity of their verdict becomes uncertain," it violates a defendant's right to due process and Sixth Amendment rights to an impartial jury trial and to a unanimous verdict. *Id.* at 1148.

The District Court's instruction in this case is not a typical *Allen* charge. Generally, such an instruction urges deadlocked jurors to "review and reconsider the evidence in the light of the views expressed by other jurors" so as to avoid a mistrial. *Darks v. Mullin*, 327 F.3d 1001, 1013 (10th Cir. 2003). Nonetheless, this Court must determine whether the supplemental charge improperly coerced a jury verdict. *Id.*; *McElhiney*, 275 F.3d at 941. Factors to consider in determining whether a supplemental instruction coerced a verdict include: "(1) the language of the instruction, (2) whether the instruction is presented with other instructions, (3) the timing of the instruction, and (4) the length of the jury's subsequent deliberations." *Darks*, 327 F.3d at 1013 (quotations omitted).

In the first part of the inquiry, this Court asks whether the language of the instruction is "coercive, or merely the proper exercise of [the district court judge's] common law right and duty to guide and assist the jury toward a fair and impartial verdict." *United States v. Arney*, 248 F.3d 984, 988 (10th Cir. 2001) (quotations omitted). There is nothing inherently coercive about the language used by the District Court. Although the instruction lacked protective language

assuring jurors holding the minority position that they were not required to relinquish firmly held convictions, it did not include any language asking jurors to reconsider their views and to change them if they believed they were wrong; it did not press hold-out jurors to yield to the majority position; and it did not impose any time restrictions on the deliberations. *See Darks*, 327 F.3d at 1014; *see also Arney*, 248 F.3d at 988 (an instruction directed at all jurors, rather than only those holding the minority view, reduces the possibility of coercion). Further, though the District Court "ordered" and "directed" the jury to seal any unanimous decisions—guilty or not guilty—in a sealed envelope while they continued to deliberate on the remaining defendants, it did not instruct them to reach a unanimous verdict as to any remaining defendants or charges. In fact, the District Court emphasized that they "don't have to do anything" if the jurors had not reached a unanimous decision.

The Appellants argue that the absence of cautionary language to ameliorate the coercive effect of the supplemental instruction—such as reminding jurors that they should not surrender their conscientiously held convictions and that the burden of proof belongs to the Government—makes this instruction per se coercive. To this end, they cite our opinion in *United States v. McElhiney*, in which this Court stated that it "has never . . . approved of an *Allen* charge that failed to incorporate an admonition regarding the juror's conscientiously held convictions." 275 F.3d 928, 943 (10th Cir. 2001). Despite the Appellants'

assertions to the contrary, however, *McElhiney* did not spell out a per se rule regarding coercion. Instead, we found that the absence of cautionary language in that case meant that the coercive effect of the instruction was "substantially heightened." *See id.* at 944. Here, however, we harken back to the language of the particular instruction and find that it was not inherently coercive.[11]

In the next two steps of the analysis, we consider the timing of the instruction and whether it was presented with other instructions. While the preferred practice is to give an *Allen* charge prior to jury deliberations and along with other instructions, there is no per se rule against giving an *Allen* charge once the jury has begun to deliberate. *Arney*, 248 F.3d at 988–89. In fact, this Court has found on numerous occasions that *Allen* charges given during deliberations were not unduly coercive. *Id.* at 989 (listing cases). Moreover, the District Court called the jury in to give the instruction on the court's own accord, before the jury indicated that it was deadlocked, which makes this instruction less coercive. *See id.*

Finally, we look at the subsequent length of jury deliberations once the supplemental instruction has been given. There is a suggestion of coercion when a jury returns a verdict soon after the supplemental instruction. *Darks*, 327 F.3d

---

[11]We also note that since our decision in *McElhiney,* we have approved of at least one *Allen* charge that did not contain the recommended cautionary language. *See Darks*, 327 F.3d 1014 (jury not coerced in returning death sentence).

at 1016. In this case, the jury resumed deliberations after receiving the instruction at 4:00 p.m. Within the hour, the jury had sealed five verdicts in envelopes. The jury was then excused for the day and they reconvened the next morning. After approximately five to six hours of deliberation that day, they reached verdicts on the remaining counts. Because the verdict forms were dated, the record is clear that the verdicts the jury put into envelopes shortly after the instruction included complete acquittals for four of the defendants, and a guilty verdict as to Mr. Verbickas on one count and acquittals on the remaining counts. The verdicts returned the following day convicted Mr. LaVallee and Mr. Schultz of two counts each and acquitted them of the other counts. In this case, because the jury had not indicated that it was deadlocked as to any of the defendants, it is reasonable to conclude that the jury had already reached unanimous decisions as to the five verdicts sealed on June 23, even before the instruction was given—indeed, the jury had already deliberated for ten days at that point. In addition, it was almost a full day later that the jury reached verdicts as to Messrs. Schultz and LaVallee. *See Darks,* 327 F.3d at 1016 (upholding verdict returned twenty minutes after the challenged instruction). After viewing the supplemental instruction in light of the totality of the circumstances, we conclude that it was not coercive and therefore did not deny the Appellants their rights to a fair trial, an impartial jury, and a unanimous verdict.

b.      Partial Verdict Instruction

-31-

In trials with multiple defendants, Fed. R. Crim. P. 31(b) permits a jury to return a verdict at any time during its deliberations as to any defendant about whom it has unanimously agreed.  The Appellants argue that the supplemental instruction "ordering" the jurors to seal verdicts in envelopes improperly invaded the province of the jury regarding how it conducted deliberations.  We review submission of supplemental jury instructions once the jury has retired for an abuse of discretion.  *United States v. Arias-Santos*, 39 F.3d 1070, 1075 (10th Cir. 1994).

The District Court, in giving its supplemental instruction, initially repeated the language of Instruction No. 29, but it then altered that language by ordering the jury to seal any unanimous verdicts it had already reached.  In other words, unlike Instruction No. 29, which afforded the jury discretion as to whether or not to return any partial verdicts, the supplemental instruction effectively removed that discretion by directing the jury to return any partial verdicts that had been reached at that point.  Thus, the supplemental instruction clearly had the potential to infringe on the jury's discretion to decide for itself what deliberative process to utilize and undoubtedly infringed on the jury's discretion to decide when, if at all, to report a partial verdict.  *See United States v. DiLapi*, 651 F.2d 140 (2d Cir. 1981) (discussing right of jury to return partial verdict in multi-defendant trial). We therefore hold that giving such an instruction was error.  Nevertheless, we need not remand if we conclude that the error was harmless beyond a reasonable

doubt. *See Stiger*, 413 F.3d at 1191 (potential error in verdict form did not warrant remand when any error did not affect the outcome of the trial).

The Appellants argue that the partial verdict instruction had the same effect as an *Allen* instruction, i.e., improperly coercing the jury to reach a verdict as to the charges still being deliberated at the time the District Court gave the supplemental instruction. We concluded above that this instruction did not coerce the jury's verdict. As such, we hold that the District Court's error in giving the supplemental instruction was harmless beyond a reasonable doubt.

C.   Cumulative Error

The Appellants argue that they were denied their due process right to fundamental fairness through the combined effect of three discovery errors and thirteen errors in admitting testimony. A cumulative error analysis aggregates all the errors that individually are harmless, and therefore not reversible, and "analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990) (en banc). "Only actual errors are considered in determining whether the defendant's right to a fair trial was violated." *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002).

1.   *Discovery Rulings*

Ms. Gutierrez was one of the Government's principal witnesses for both the conspiracy and assault charges. In March 2002, more than a year before trial

-33-

commenced, Mr. Verbickas filed a motion for the production of Ms. Gutierrez's

psychiatric records to be used during cross-examination as impeachment

evidence.  The District Court denied the motion because the documents requested

were privileged and the defendants cited no relevant authority to suggest that

privileged documents were subject to discovery for purposes of cross-

examination.[12]  The Appellants argue that this ruling violated their Sixth

Amendment right to confront witnesses against them.  *See Delaware v. Fensterer*,

474 U.S. 15, 18–19 (1985) (per curium) (stating that the right to confront a

witness includes the right to conduct cross-examination).

The Appellants have failed to provide this Court with any relevant authority

suggesting that the Confrontation Clause permits them to discover the privileged

medical records of an adverse witness.  Even so, we undertook our own review of

the case law and find that the Appellants's Sixth Amendment rights were not

implicated by the District Court's order.

The Confrontation Clause is not a "constitutionally compelled rule of

pretrial discovery."  *Pennsylvania v. Ritchie*, 408 U.S. 39, 51 (1987).  In rejecting

the defendant's claim that the trial court's refusal to permit discovery of

---

[12]The District Court also denied the motion because the motion was
improperly filed under Fed. R. Crim. P. 17(c), rather than the general discovery
statute, Fed. R. Crim. P. 16.  *See Bowman Dairy Co. v. United States*, 341 U.S.
214, 219 (1951) (stating that Rule 17(c) is not intended to provide a means of
discovery for criminal cases).

-34-

privileged communications by his accuser to be used during cross-examination

violated his right to confront witnesses against him, the Court in *Ritchie* stated:

> [T]he right to confrontation is a *trial* right, designed to prevent
> improper restrictions on the types of questions that defense counsel
> may ask during cross-examination. The ability to question adverse
> witnesses, however, does not include the power to require the pretrial
> disclosure of any and all information that might be useful in
> contradicting unfavorable testimony. Normally the right to confront
> one's accusers is satisfied if defense counsel receives wide latitude at
> trial to question witnesses. In short, the Confrontation Clause only
> guarantees an opportunity for effective cross-examination, not
> cross-examination that is effective in whatever way, and to whatever
> extent, the defense might wish.

*Id.* (citations, quotation marks, and footnote omitted). There is no indication in

this case that the Appellants did not have the opportunity to cross-examine Ms.

Gutierrez effectively. Indeed, the District Court did not appear to limit the scope

of questions that the defendants could ask Ms. Gutierrez on cross-examination.

Thus, there has been no Sixth Amendment violation.

The Appellants' next claim of error in discovery relates to alleged promises

made by the Government to Ms. Gutierrez in exchange for her testimony at trial.

Specifically, the Appellants point out that Ms. Gutierrez pleaded guilty to

violating 18 U.S.C. § 242, which the District Court considered to be a "crime of

violence." Nevertheless, she was released pending sentencing, which is only

permitted pursuant to 18 U.S.C. § 3143(a)(2) when the court "finds by clear and

convincing evidence that the person is not likely to flee or pose a danger to any

other person or the community" and either "there is a substantial likelihood that a

motion for acquittal or new trial will be granted[,] or an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person." 18 U.S.C. § 3143(a)(2); *see also* 18 U.S.C. § 3142(f)(1)(A) (including crimes of violence in subsection (A)). According to the Appellants, an off-the-record colloquy took place between Ms. Gutierrez and her counsel, the magistrate judge, and the Government. The Appellants claim that the District Court made a discovery ruling prohibiting them from discovering the substance of this conversation and that such ruling violated their due process rights under *Giglio v. United States*, 405 U.S. 150, 154 (1972).

We decline to review this claim of error. In addition to failing to supply relevant legal authority,[13] the Appellants fail to cite to references in this ninety-volume, ten-thousand-page transcript where this issue was raised and ruled upon below. *See* 10th Cir. R. 28.2(C)(2) and (3); *United States v. LaHue*, 261 F.3d 993, 1014–1015 (10th Cir. 2001). Due to these failures, this court cannot even attempt to assess the merits of this argument.

Appellants next argue that the District Court erred in refusing to permit them to discover the substance of an interview by the Government of Mr. Britt. Mr. Britt was twice interviewed by the Government prior to giving testimony in

---

[13]The Government correctly points out that the cases upon which the Appellants rely, *United States v. Brady*, 373 U.S. 83 (1963) and *Giglio*, 405 U.S. 150, relate to the Government's suppression of evidence, not a district court's erroneous evidentiary rulings.

this case.  One interview was reduced to writing; the other was not.  After direct

and cross-examination of Mr. Britt, counsel for Mr. Verbickas sought permission

from the District Court to put Mr. Britt back on the witness stand to determine

whether a second statement was in fact recorded.  The District Court asked the

Government whether there were any other written statements, to which Mr.

Blumberg said no.  The court then instructed the defendants to file a written

motion to recall Mr. Britt to the stand.  There is nothing in the record indicating

that any of the defendants filed such motion.  Therefore, any error appears to be

that of the Appellants.

Finally, the Appellants argue that the District Court erred in refusing to

allow Mr. Verbickas's counsel to cross-examine Mr. Britt as to whether he knew

of Mr. Lane's history of violence.  Mr. Britt testified on direct that Mr.

Verbickas's use of force against Mr. Lane was excessive and contravened the

BOP "Use of Force" policy.  Counsel for Mr. Verbickas cross-examined Mr. Britt

and asked him detailed questions about his knowledge of Mr. Lane's history of

violence.  After a while, the Government objected on the grounds that Mr.

Verbickas's counsel was, in effect, testifying about Mr. Lane's violent

background.  The District Court sustained the objection in part, permitting

counsel to "ask the witness if he has any knowledge about why Lane was at [a

medical facility], without your question revealing why he was there."  The court

further stated, "I'm not foreclosing this evidence, but I'm foreclosing it through a

-37-

witness that doesn't know anything about it." The Appellants argue that this prohibited the jury from evaluating the basis of Mr. Britt's testimony that Mr. Verbickas's use of force was excessive. We conclude that this argument has no merit. The District Court did not prevent the Appellants from asking about Mr. Britt's foundation for his testimony.

2.     *Evidentiary Rulings*

The Appellants make several additional objections on appeal that relate to Ms. Gutierrez's testimony. First, they argue that the Government improperly asked her two leading questions. Only one of these questions was objected to, however, and the District Court sustained the objection before Ms. Gutierrez could answer the question. In addition, the Appellants argue that the District Court erred in prohibiting testimony regarding a purported prior inconsistent statement made by Ms. Gutierrez. Specifically, the Appellants argue that after Ms. Gutierrez testified about inmate abuse at USP-Florence, the court should have permitted them to call Lieutenant Mark Mooneyham to testify that Ms. Gutierrez had, in fact, previously told him that she had no knowledge of inmate abuse at USP-Florence and that Mr. Blumberg threatened that she might lose custody of her children if she did not cooperate with the Government's investigation. During her testimony, however, Ms. Gutierrez admitted that she had previously made that statement to Mr. Mooneyham. The District Court ruled that Ms. Gutierrez's testimony was consistent with what Mr. Mooneyham would testify to and

-38-

therefore Fed. R. Evid. 613(b) did not apply.  We find no error in any of these rulings.[14]

Next, the Appellants argue that the Government improperly elicited testimony that they had reputations for violent behavior.  They complain of the following colloquy between Mr. Blumberg and Raymond Holt, the warden at USP-Florence:

> Q: Did you obtain information—excuse me.  Did you learn the reputation of individuals or the character of being unnecessarily violent relating to certain correctional officers at Florence?
>
> A: Yes.
>
> Q: Did you learn that reputation for a correctional officer named Rod Schultz?
>
> A: Yes.
>
> [Mr. Schultz's counsel objected and the objection was overruled.]
>
> Q: Did you learn that reputation for a correctional officer named Mike LaVallee?
>
> A: Yes.
>
> Q: Did you learn that reputation for a correctional officer named Ken Shatto?
>
> A: Yes.

---

[14]The Appellants also object to a question asked by Mr. Blumberg on re-direct examination as to whether Ms. Gutierrez had ever met Mr. LaVallee's attorney in the presence of the defendants.  We discuss this question *infra* in section IV and conclude that permitting the question did not constitute error.

-39-